**HINCKLEY, ALLEN & SNYDER LLP**
Mitchell R. Edwards, Esq.
100 Westminster Street, Suite 1500
Providence, RI 02903
Telephone: 401-274-2000
Facsimile: 401-277-9600
medwards@hinckleyallen.com

Christopher V. Fenlon, Esq. (*pro hac vice* to be filed)
Kylie M. Huff, Esq. (*pro hac vice* to be filed)
30 South Pearl Street, Suite 901
Albany, New York 12207
Telephone: (518) 396-3100
Facsimile: (518) 396-3101
cfenlon@hinckleyallen.com
khuff@hinckleyallen.com

**MARKS & KLEIN, LLC**
Justin M. Klein, Esq.
Brent M. Davis, Esq.
331 Newman Springs Rd., Bldg. 1
4th Floor, Suite 143
Red Bank NJ 07701
Telephone: (732) 747-7100
Facsimile: (732) 784-2850
justin@marksklein.com
brent@marksklein.com
*Attorneys for Plaintiff*
*The Beverage Works NY, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE BEVERAGE WORKS NY, INC.,<br><br>                        Plaintiff,<br><br>    -against-<br><br>RED BULL NORTH AMERICA, INC.,<br><br>                         Defendant. | Civil Case No.: 24-cv-5745<br><br>**VERIFIED COMPLAINT** |

Plaintiff The Beverage Works NY, Inc. ("Beverage Works"), by and through its undersigned counsel, as and for its Verified Complaint against Defendant Red Bull North America, Inc. ("RBNA"), alleges as follows:

## NATURE OF THE CASE

1.     This action is brought to obtain declaratory relief for Beverage Works, whose principal place of business is 2211 Allenwood Road, Wall, New Jersey, who was contractually engaged to operate as a franchisee for RBNA, whose principal place of business is 1740 Stewart Street, Santa Monica, CA, for violations of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, et seq. ("NJFPA").

2.     RBNA has improperly attempted to terminate Beverage Works, the New Jersey and New York metropolitan area distributor of Red Bull "energy drink" products ("Red Bull Products"), in violation of the NJFPA.

3.     Beverage Works operates out of its corporate headquarters and two warehouses in the State of New Jersey as a party to a distribution agreement with RBNA.

4.     Beverage Works became a franchisee of RBNA on or about March 16, 2000, when Beverage Works entered into a distribution agreement (the "Existing Distribution Agreement") with Red Bull.  A true and correct copy of the Existing Distribution Agreement is attached hereto as Exhibit A.

5.     Thereafter, Beverage Works and RBNA entered into a new distribution agreement on or about July 11, 2008 (the "Distribution Agreement"), whereby Beverage Works agreed to distribute Red Bull Products in the State of New Jersey, the five boroughs of New York City and Long Island, as well as the counties of Dutchess, Orange, Rockland, Sullivan, Ulster and Westchester (collectively, the "Territory"). A true and correct copy of the Distribution Agreement is attached hereto as Exhibit B; a true and correct copy of the July 5, 2010 Amendment to Distribution Agreement is attached as Exhibit C.

6.     RBNA is the exclusive importer of Red Bull Products in the United States.

7.     Red Bull is an "energy drink" that was first developed in Europe in the early 1980s. Red Bull was introduced into the United States in 1998 and it has grown in popularity since that time due, in part, to Beverage Works' efforts.

8.     When Beverage Works first became a franchisee in 2000, Red Bull was not well known in the Territory.  Beverage Works has actively promoted Red Bull at significant expense, and its efforts have been extremely successful.

9.     During the Franchise, RBNA's demands for financial investment by Beverage Works were unrelenting.  RBNA required Beverage Works to financially support the Red Bull brand, including through equipment, mandated discounted pricing, marketing events, advertisements, and other financial contributions that went well beyond the payment for the Red Bull Products that Beverage Works sold to retailers.

10.    Beverage Works dutifully complied with the terms of the Distribution Agreement.

11.    In fulfillment of its obligations under the Distribution Agreement, Beverage Works trained its sales force in accordance with RBNA's requirements, and successfully marketed, promoted, and sold and promoted Red Bull Products.

12.    On or about March 19, 2024, however, RBNA notified Beverage Works that RBNA would be terminating Beverage Works' franchise effective June 2, 2024.  A true and correct copy of the March 19, 2024 termination notice is attached hereto as Exhibit D ("Termination Notice").

13.    In the Termination Notice, RBNA expressly stated that RBNA's determination to terminate Beverage Works as a distributor was a Termination Without Cause.

14.    During the time period from Beverage Works' formation in 2000 to the present when Beverage Works operated as an RBNA franchisee (the "Franchise"), Beverage Works distributed Red Bull Products only.

15.     On several occasions during the Franchise, Beverage Works sought RBNA's permission to distribute products other than Red Bull Products, including non-competitive products, in order to diversify its product portfolio so that it would not be solely dependent upon RBNA to generate revenue.

16.     On each such occasion, RBNA rejected Beverage Works' reasonable request and refused to allow Beverage Works to distribute any other products.

17.     During the Franchise and at RBNA's request, Beverage Works made substantial capital investments, hired and trained employees, acquired and improved warehouses, and made other investments all of which were specific to the growth of the Red Bull brand, only for RBNA to suddenly and without justification terminate Beverage Works and destroy its business, capitalize on Beverage Works' efforts, and appropriate the Territory.

18.     RBNA's attempt to terminate Beverage Works' Franchise will destroy Beverage Works, eliminate the livelihood of its owners and executives, and result in the termination of hundreds of employees.

19.     RBNA's actions render RBNA liable to Beverage Works for violations of the NJFPA.

## PARTIES

20.     Beverage Works is a New York corporation registered to do business in the State of New Jersey with a principal place of business in Wall, New Jersey, a warehouse in Wall, New Jersey, and a warehouse in East Hanover, New Jersey.

21.     RBNA is a California corporation with its principal place of business in Santa Monica, California.

22.     Beverage Works is a statutory franchisee for RBNA.  Beverage Works performed distribution, merchandizing and sales services to local retailers of Red Bull Products.

## JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.  The value of the declaratory relief sought by Beverage Works, which will preserve its entire business, far exceeds $75,000.

24.     Venue is proper in this Court under 28 U.S.C § 139l because a substantial part of the events or omissions giving rise to the claim occurred in the State of New Jersey, Beverage Works' headquarters is located in Wall, New Jersey, and Beverage Works is entitled to the protections of the NJFPA.

25.     Although the Distribution Agreement contains a forum-selection clause, such clauses in contracts subject to the NJFPA are presumptively invalid.

26.     The forum-selection clause in the Distribution Agreement was imposed on Beverage Works by RBNA because of RBNA's superior bargaining power.

27.     The forum-selection clause in the Distribution Agreement is invalid and unenforceable.

## FACTUAL ALLEGATIONS

28.     As the exclusive importer of Red Bull Products in the United States, RBNA distributes Red Bull Products to retail customers through distributors to whom RBNA grants the rights to sell and distribute Red Bull Products in defined territories.

29.     In order to build the Red Bull brand in the United States, RBNA has relied on a network of independent distributors, including Beverage Works, who made substantial investments to successfully market and sell Red Bull Products.

30.     No entity may wholesale RBNA's products in the United States without express permission from RBNA pursuant to a written agreement.

31.     Upon information and belief, Red Bull was not distributed in the Territory prior to April 2000.

32.     Beverage Works was formed in 2000 solely for the purpose of distributing RBNA's products in the Territory.

33.     On or about March 16, 2000, RBNA and Beverage Works entered into the written Existing Distribution Agreement.

34.     On or about July 11, 2008, RBNA and Beverage Works entered into the written Distribution Agreement.

35.     The terms of the Distribution Agreement were set by RBNA and were not negotiable.

36.     Beverage Works sought to negotiate the terms of the Distribution Agreement, including a request for the ability to distribute products other than Red Bull products, but RBNA refused to do so.

37.     RBNA dictated the terms of the parties' relationships and would not agree to any changes to its form of contract.   Beverage Works thus hesitantly signed the Distribution Agreement, and informed RBNA that "As you are well aware of, we disagree with quite a few things in this contract; but the reality is we have no choice but to sign or go out of business.  We will continue, as we have in the past, to rely on the good will and faith in both Red Bull as a company, and ourselves in our ability to perform for Red Bull."  *See* Ex. E, June 26, 2008 Letter from J. Ponsiglione to RBNA.

38.     During the Franchise, RBNA controlled every aspect of Beverage Works' business. In fact, Beverage Works had to provide reports to RBNA documenting its inventory, sales, service calls, deliveries, marketing plans, and advertising on a regular basis.   *See* Ex. F, Section V.I.1, Amendment to Distribution Agreement dated November 28, 2012.  The Distribution Agreement

also requires that Beverage Works provide "such other financial data and statistical information as [RBNA] may request for purposes of internal operational control, marketing purposes and to monitor [Beverage Works'] compliance with [the Distribution Agreement]." *Id.*

39.     RBNA trained Beverage Works employees and then evaluated them annually per RBNA's national evaluation standards, set pricing for a significant majority of retail accounts, dictated sales communications and cadences, influenced delivery routes and customer visit schedules, required marketing investments, and provided input regarding the purchase of certain software and equipment.

40.     The Distribution Agreement between RBNA and Beverage Works is a franchise agreement under the NJFPA because it, *inter alia*, comprehensively governs: marketing, sale and distribution of product; requirements for maintenance of warehouses as a loading, storage and receiving facility; advertising; the use of proprietary marks and confidential information; efforts to maximize Red Bull Products' reputation, good will, acceptance, and consumer awareness; and Beverage Works' obligations to use its best efforts to market, promote, distribute and sell product to accounts in the Territory.

41.     Specifically, the Distribution Agreement appoints Beverage Works as an "authorized distributor" with the right to purchase Red Bull Products (Ex. B, Distribution Agreement, ¶ II(A)(1)).

42.     As an "authorized distributor," Beverage Works has the right to sell Red Bull Products to customers in the Territory (*Id.*, Schedule B).

43.     In exchange, Beverage Works agreed to purchase Red Bull Products from RBNA, and to diligently "market, distribute, and sell" Red Bull in the Territory using "Van Sales Teams" (*Id.*, ¶ II(A)).

44.     The Distribution Agreement requires, among other things:

a.     Beverage Works must "market, distribute and sell" Red Bull Products using "Van Sales Teams," pursuant to specific rules established by RBNA (*Id.*, ¶ II(A)(4));

b.     Beverage Works is required to decorate its delivery vehicles pursuant to Red bull specifications (*Id.*, ¶ II(A)(4)(b));

c.     Beverage Works is prohibited from using delivery vehicles used to deliver Red Bull Products for the delivery of any other product (*Id.*, ¶ II(A)(4)(e));

d.     Beverage Works is prohibited from assisting any of RBNA's competitors with the sale of products that compete with Red Bull Products (*Id.*, ¶ II(D)(3));

e.     Red Bull may conduct random inspections of Beverage Works warehouses (*Id.*, ¶ IV(B) and (C));

f.     Beverage Works must make its "best efforts" to sell Red Bull product and to maintain good will with the public (*Id.*, ¶ V(A) and (B));

g.     Beverage works must maintain specific personnel to sell Red Bull Products (*Id.*, ¶ V(F)(2));

h.     Beverage Works must comply with specific reporting requirements to RBNA (*Id.*, ¶V(I)); and

i.     Beverage Works must comply with advertising and display requirements (*Id.*, ¶ VI(C) and (D)).

45.    Pursuant to the Distribution Agreement, RBNA granted Beverage Works a license to use RBNA trademarks and other intellectual property (*Id.*, ¶VII & Schedule D).

46.    The Distribution Agreement prohibits Beverage Works from selling any "Competitive Product," which is defined to include any beverage or food product "which claims

to improve personal energy, physical or cognitive performance, endurance, vitalization or offer comparable benefits" (*Id.*, ¶II(D)(3)).

47.     RBNA has engaged in an unlawful restraint of trade by refusing Beverage Works permission to distribute any other beverages.

48.     During the Franchise, Beverage Works was forced to decline many opportunities to represent other beverage brands, including brands that are not "Competitive Products," because RBNA refused Beverage Works permission to do so.

49.     The Distribution Agreement (¶ IV(B)) also expressly requires Beverage Works to maintain a warehouse in the Territory to fulfill its obligations under the Distribution Agreement.

50.     The parties reasonably anticipated that Beverage Works would establish a New Jersey place of business.

51.     During negotiations of and performance under both the Existing Distribution Agreement and the Distribution Agreement, RBNA knew that Beverage Works would establish, and did in fact establish, a place of business in the State of New Jersey.

52.     During the Franchise, Beverage Works operated out of warehouses in Wall and East Hanover, New Jersey, at which Beverage Works received shipments of Red Bull Products for sale to retail outlets.

53.     Beverage Works does not make sales directly to consumers.

54.     Beverage Works take inventory from its warehouses and re-sells that inventory to retailers in its Territory as a wholesale distribution business.

55.     Beverage Works maintained an office and warehouses from which Beverage Works personnel visit customers and from which Red Bull Products are delivered to customers.

56.     Beverage Works purchased well over $35,000 worth of RBNA's products in the twelve months preceding the Termination Notice.   A true and correct copy of a report from

Beverage Works' accounting system reflecting purchases from RBNA during the period April 2023 through March 2024 is attached hereto as Exhibit G.

57.     All of Beverage Work's gross sales were derived from the RBNA franchise. Beverage Works' business does not have any other source of income.

58.     Upon information and belief, the retailers to whom Beverage Works sells Red Bull Products believe there is a connection between RBNA and Beverage Works such that RBNA is responsible for the overall performance, quality, image, good will, and service provided by Beverage Works.

**RBNA Dictated Beverage Works' Marketing Plans**

59.     RBNA organizes, produces, and requires that franchisees participate in marketing plans that are designed to create good will with the customers. RBNA instructs franchisees how to display and organize products on store shelves, negotiates prices for products, publishes print advertisements, and interacts with management of chain stores to ensure that the stores are satisfied with Red Bull Products and the distribution thereof.

60.     Beverage Works was required during the Franchise to purchase and implement marketing displays promoting Red Bull Products. RBNA required Beverage Works to follow its printed instructions for presenting Red Bull Products.

61.     Beverage Works is integral to RBNA's marketing scheme.  For example, Beverage Works: delivered marketing displays to stores, displayed Red Bull Products in stores, requested floor or shelf space for advertisements, and was the face of Red Bull to local customers.

62.     RBNA controlled almost all aspects of Beverage Works' distribution and sales of the Red Bull Products.  RBNA (not Beverage Works) established pricing and marketing programs and required all distributors to participate in the same initiatives to drive RBNA's profit, not the profit of individual distributors.

10

63.     RBNA issued a national guide, or "Planogram," that set forth the way in which all distributors should configure Red Bull displays in retail stores to ensure a consistent display appearance nationally. RBNA held an annual meeting of its "Eastern Business Unit" attended by all distributors in the Northeast United States.  At these meetings, RBNA presented a variety of topics, including setting regional marketing strategies for the next year, consumer and sales trends, how the distributors could leverage the regional structure and how to sell to certain retailers.

64.     In addition, RBNA held Monthly Planning and Review ("MPR") Meetings, which were either held at RBNY's or Beverage Works' offices.  The purpose of these meetings was for RBNY to deliver monthly objectives and plans for Beverage Works to follow to achieve those objectives.

65.     As part of its effort to hold RBNA and Beverage Works out to third parties as one and the same, RBNA required Beverage Works to purchase jackets, shirts, hats, and other apparel bearing Red Bull trademarks and logos for Beverage Works employees to wear while they worked.

66.     Beverage Works uses, and RBNA authorized such use, of logos and trademarks throughout Beverage Works' business, including on all vehicles, all employees' shirts and jackets, invoices, business cards, and the like.  This authorized usage was vouched for by RBNA and not merely in a limited capacity.

67.     In connection with the parties' performance under the Distribution Agreement, RBNA demanded that Beverage Works follow a marketing plan designed by RBNA, that included, but was not limited to requirements that:

     a.     Beverage Works service the market with a business system of employees and equipment dictated by RBNA and dedicated solely to the sales and delivery of the Red Bull Products;

     b.     Beverage Works deliver the Red Bull Products in vehicles prescribed by

RBNA and decorated with Red Bull logos designed by Red Bull;

c.      Beverage Works employees undergo extensive training in the Red Bull marketing system;

d.      Beverage Works employees wear uniforms prescribed by Red Bull;

e.      Beverage Works declined business and other opportunities to represent other beverage brands; and

f.      All aspects of Beverage Works' record keeping, reporting and execution of the Red Bull business be in accordance with procedures dictated by RBNA.

**RBNA Controlled Beverage Works' Pricing**

68.    RBNA (not Beverage Works) set the price that national and regional chain stores paid Beverage Works for Red Bull Products.  Beverage Works had to participate in the chain pricing that RBNA established nationally.  RBNA directly arranged the sales to certain chain stores.  Beverage Works delivered the Red Bull Products to the chain stores as instructed by RBNA, and RBNA would capture the information about products delivered via nightly transmissions from Beverage Works.  The chain would pay RBNA directly for the Products that Beverage Works delivered to the chain, and Beverage Works would then get a check from RBNA.  RBNA refused to allow Beverage Works to change the price paid by these stores.

69.    For independent accounts, RBNA set prices and created contracts that Beverage Works was required to present to retail accounts as part of its "VIP Program."  The price that independent retailers paid for Red Bull Products depended on the merchandising level to which the retail account agreed to commit.  For example, a retail store that agreed to devote more prominent shelf space to Red Bull Products paid a lower price.  The discounted pricing cut significantly into the amount that Beverage Works would otherwise receive for selling Red Bull

Products, but Beverage Works did not have the ability to opt out of the VIP Program.  Beverage Works had to meet RBNA's quota for the number of "VIP" accounts Beverage Works set up in its territory.  As such, the VIP contracts benefited RBNA through increased sales, at the expense of Beverage Works, which found its margins increasingly shrinking.  RBNA received the financial benefit from the VIP Program, but Beverage Works had no choice but to sell the Red Bull Products upon the terms set by RBNA.

70.    Through these programs, RBNA established pricing for approximately 97% of Beverage Works' sales.

**Beverage Works Generated Good Will for RBNA's Red Bull Products That Is Not Transferrable**

71.    Through its investment of capital, labor, and specialized skills, Beverage Works created good will with the customers in the Territory.

72.    Good will for Red Bull Products is not transferrable outside of an RBNA statutory franchise because the good will created is for intangibles such as shelf space, end cap displays, the right to place free-standing displays in stores, and high-value middle shelf space.

73.    Good will is store-specific. Individual retail store managers approve shelf space, promotional displays, and more valuable product placement. The relationship with store management and customers is crucial to building and maintaining good will.

74.    Beverage Works cannot use the shelf space, promotional space, or high value placement anywhere but the stores in the Territory.

75.    Beverage Works cannot use the shelf space, end caps, promotional display space, or high value shelf space because such items are approved for specific brands of products. For example, Beverage works would not be permitted to display other energy drinks or soft drinks in the space approved for Red Bull Products.

76.    The Distribution Agreement expressly requires Beverage Works to make

13

substantial investments that will have no utility outside the distribution of Red Bull Products.

**RBNA Imposed Personnel and Training Policies and Standards on Beverage Works**

77.     RBNA dictated Beverage Works' core business operations, including recruiting, staffing, incentive plans, training, and culture.

78.     In a typical year, Beverage Works employees spent over ninety (90) days in the aggregate preparing for, traveling to and attending mandatory Red Bull meetings, conferences, reviews, and trainings.  Red Bull directly trained Beverage Works' employees according to Red Bull standards of sales and marketing techniques that RBNA required from its distributors nationally.  Beverage Works employees had to complete a Red Bull marketing course known as the "Perfect Store Certification," to be trained on the marketing and sales tactics that RBNA required from all distributors so that the Red Bull sales experience would be the same whether it occurred in New Jersey or California.  RBNA imposed a new evaluation system for Beverage Works employees, required a "power trainer," and demanded that Beverage Works hire a certain number of sales team members.

79.     Beverage Works could not engage a general manager unless RBNA met with and approved the hire.  RBNA even provided guidelines for the annual evaluations.  RNBA directly managed Beverage Works' general manager by meeting with such employee every 30 days to communicate strategy and expectations for the coming month (i.e., MPR Meetings).

**RBNA Demanded That Beverage Works Make Substantial Expenditures in Support of the Red Bull Brand**

80.     During the Franchise, RBNA required Beverage Works to expend substantial amounts of money, including but not limited to:

        a.     Hiring new employees;

        b.     Purchasing and leasing Red Bull delivery vehicles;

        c.     Purchasing uniforms for employees;

d.      Spending considerable funds associated with the training employees, including travel, and personnel time and resources;

e.      Upgrading its warehouses and facilities to the "Red Bull Culture"; and

f.      Contributing to retailer promotional and shelf space programs determined by and negotiated by RBNA, including making payments to retailers for placement of the Red Bull Products in their stores, with free products to retailers.

81.      In addition, RBNA required Beverage Works to purchase a luxury skybox for the New York Red Bulls Soccer Club arena located in Harrison, New Jersey.

82.      RBNA instructed Beverage Works to make specific improvements to its warehouses.  For example, in or about 2005, RBNA required Beverage Works to spend $800,000 on upgrades to its Brooklyn warehouse.

83.      Beverage Works incurred these expenses and made these payments in good faith, at the request of RBNA, and with RBNA's knowledge, to demonstrate its commitment to the RBNA relationship.

84.      Since 2000, Beverage Works has been consistently among the top Red Bull distributors in the United States, and Beverage Works has increased the volume of Red Bull Products it sold year over year.  Beverage Works is the largest RBNA distributor by volume in the United States.

85.      Throughout Beverage Works' time as a RBNA distributor and franchisee, the sales of Red Bull Products in the Territory has been extremely successful.

86.      As a result of Beverage Works' efforts, Red Bull is the top-selling "energy drink" in the Territory and enjoys double the market share of Red Bull's top competitor, Monster.

87.      The strength of Red Bull sales in the Territory is due to Beverage Works'

15

specialized focus on the Red Bull product in a complex market and RBNA's significant investments in the Red Bull distribution business in response to RBNA's demands.

88.     Today, Beverage Works has approximately 350 employees whose jobs will be lost if RBNA's wrongful termination is permitted to take effect.

89.     During the nearly twenty-five (25) year Franchise, from March 2000 to March 2024, the parties operated in partnership, as franchisor and franchisee, to make Red Bull a successful product for both parties.

90.     At all times, Beverage Works has fulfilled its contractual obligations to RBNA.

91.     Despite the undisputed success of Beverage Works' distribution of Red Bull Products for RBNA, on March 19, 2024, RBNA's Executive Vice President/General Manager, East BU, Bill Connors, sent Beverage Works the Termination Notice purporting to exercise its right to terminate the Distribution Agreement.

92.     The Termination Notice states that the termination will take effect June 3, 2024.

93.     The termination is part of a calculated scheme.  RBNA induced Beverage Works to expend substantial money, time, and effort to grow the Red Bull brand and expand operations, only to take over the Territory to keep a greater share of the profit.

94.     Upon information and belief, RBNA intends to take over the Territory and establish a new distributorship that is owned by RBNA.

95.     If the termination takes effect, it will cause Beverage Works irreparable injury that cannot be remedied by a money judgment or any other remedy at law.  As a result of RBNA's conduct, Beverage Works only sells Red Bull Products.  Beverage Works cannot obtain Red Bull Products from any other source.

96.     The termination of the Franchise would destroy Beverage Works' business, render its stock valueless, deprive Beverage Works' owners of their livelihood, and result in the

termination of approximately 350 employees.

97.     RBNA will suffer no prejudice if an injunction is granted.  Beverage Works will continue to successfully market and promote Red bull in the Territory, and RBNA will continue to enjoy the fruits of Beverage Works' efforts.

### COUNT I
### (Declaratory Judgment
### New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, et seq.)

98.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

99.     A substantial controversy exists between Plaintiff and Defendant as to whether Plaintiff is a franchisee of Defendant protected under the NJFPA.

100.    Plaintiff and Defendant have adverse legal interests because Defendant denies that Plaintiff is a franchisee of Defendant protected under the NJFPA.

101.    The controversy between Plaintiff and Defendant is ripe for adjudication.

102.    The relationship between Plaintiff and Defendant is a franchise as that term is defined under the New Jersey Franchise Practices Act, N.J.S.A. 56:10-3, including that: (a) a written agreement exists between Plaintiff and Defendant; (b) Defendant granted Plaintiff a license to use its intellectual property; and (c) there is a community of interest between Defendant and Plaintiff.

103.    Furthermore, the franchise relationship at issue here is subject to the protections of the New Jersey Franchise Practices Act, as set forth under N.J.S.A. 56:10-4 because: (a) Plaintiff maintained a place of business in New Jersey; (b) there was well over $35,000 in sales between Plaintiff and Defendant in the twelve months prior to the Termination Notice; and (c) Plaintiff derived well over 20% of its gross sales from the franchise in question.

104.    As such, pursuant to the NJFPA, Defendant could not terminate Plaintiff or unless, among other requirements, it identified good cause, defined as a "failure to substantially comply with those requirements imposed upon [Plaintiff] by" Defendant.

105.    Defendant's actions herein, including its improper attempt to terminate the Distribution Agreement without good cause, is a violation of the New Jersey Franchise Practices Act.

## COUNT II
### (New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, et seq.)

106.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

107.    As a consequence of the breaches and violations set forth herein, Plaintiff has been damaged, including its attorneys' fees and costs in bringing this action, which are recoverable under the NJFPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests of this Court the following relief:

a.    An Order temporarily restraining Defendant from terminating the Distribution Agreement and requiring that Defendant continue to supply Red Bull Products to Plaintiff and otherwise continue to perform under the Distribution Agreement pending the Court's determination on Plaintiff's motion for a preliminary injunction;

b.    An Order preliminarily enjoining Defendant from terminating the Distribution Agreement and requiring that Defendant continue to supply Red Bull Products to Plaintiff and otherwise continue to perform under the Distribution Agreement pending resolution of this dispute;

c.      An Order declaring that Plaintiff's relationship with Defendant is subject to the NJFPA;

d.      Payment of any damages, penalties, or other amounts under any applicable laws, statutes or regulations;

e.      Award Plaintiff reasonable attorneys' fees and costs as provided by N.J. Stat. Ann. § 56:10-10; and

f.      Grant such other and further legal and equitable relief as this Court deems just and necessary.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## LOCAL RULE 11.2 CERTIFICATION

The matter in controversy is not the subject of any other action pending in any other court or any pending arbitration or administrative proceeding.

Dated:  April 30, 2024

**HINCKLEY, ALLEN & SNYDER LLP**

*/s/ Mitchell R. Edwards*
Mitchell R. Edwards, Esq.
100 Westminster Street, Suite 1500
Providence, RI 02903
Telephone: 401-274-2000
Facsimile: 401-277-9600
medwards@hinckleyallen.com

Christopher V. Fenlon, Esq. (*pro hac vice* to be filed)
Kylie M. Huff, Esq. (*pro hac vice* to be filed)
30 South Pearl Street, Suite 901
Albany, New York 12207
Telephone: (518) 396-3100
Facsimile: (518) 396-3101
cfenlon@hinckleyallen.com
khuff@hinckleyallen.com

**MARKS & KLEIN, LLC**
Justin M. Klein, Esq.
Brent M. Davis, Esq.
331 Newman Springs Rd., Bldg. 1
4th Floor, Suite 143
Red Bank NJ 07701
Telephone: (732) 747-7100
Facsimile: (732) 784-2850
justin@marksklein.com
brent@marksklein.com
*Attorneys for Plaintiff*
*The Beverage Works NY, Inc.*

## **VERIFICATION**

STATE OF NEW JERSEY   )
　　　　　　　　　　　　)
COUNTY OF _Ocean_   ) ss.:

On the **26**th day of April, 2024, _Mark Ponsiglione_ of full age, being duly sworn, deposes and says that he is the _President_ of The Beverage Works NY, Inc., the Plaintiff named herein; that deponent has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to your deponent's own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

_____
Mark Ponsiglione

Sworn to before me this
**26**th day of April, 2024.

_____
Notary Public

NICOLE J NICHOLS
Commission # 2315993
Notary Public, State of New Jersey
My Commission Expires
6/27/24

21