# EXHIBIT A



**Red Bull North America, Inc.**
1450 Maria Lane, Suite 300 • Walnut Creek, CA 94596-5313
Phone: (925) 906-9198 • Fax: (925) 906-9398

March 14, 2000

Mr. Gerald Ponsiglione
The Beverage Works, Inc.
c/o Dry & Thirsty Beverage Distribution, Inc.
1729 Highway 34, Building 31
Farmingdale, NJ 07727

Dear Gerry,

    Attached are two copies of our Distributorship Agreement. Please sign both copies and return both to me for my signature via the enclosed FedEx slip. I will then return a completed copy for your permanent file.

    We have designated your territory as the New York Metro market, including Long Island, Westchester County, part of Connecticut and New Jersey. However, it is understood that these territories will be developed gradually on a mutually agreeable timetable.

    As soon as the contract is signed, The Beverage Works can place orders for product and point of sale materials.

    Peter and I look forward to working with you to build Red Bull in the New York market.

Sincerely,

Jack Dadam
Executive Vice President
Red Bull North America, Inc.

JD/mer
PINETRADNO.LTR

cc:  Peter Strahm

# DISTRIBUTORSHIP AGREEMENT

Pursuant to the terms and conditions of this Agreement, The Beverage Works, Inc. ("Distributor") is appointed to be the non-exclusive wholesale distributor of the Red Bull Energy Drink ("Product") of Red Bull North America, Inc. ("Red Bull") in the territory described on <u>Exhibit "1"</u> ("Territory").

Distributor is not entitled to distribute any other Red Bull products, present or future, unless such products are expressly authorized in writing signed by two Red Bull officers, in which event all such additional products are subject to the terms and conditions of this Agreement. The following terms and conditions are hereby agreed upon:

## I.     TERMS OF SALE

A.     Each order submitted by Distributor to Red Bull is subject to Red Bull's acceptance or rejection at its offices in Santa Monica, California. Unless Red Bull notifies Distributor of other terms of sale, all purchases by Distributor are F.O.B. Distributor's warehouse at prices established by Red Bull and effective at the time of shipment. Risk of loss and title to the Product pass when the Product is transferred by Red Bull to the carrier for shipment. Red Bull shall have no liability in the event of any rejection of or delay in filling or shipping Distributor's orders.

B.     Red Bull shall:

(1)     Promptly process and acknowledge Distributor's orders that are accepted by Red Bull. In the event of any rejection or delay by Red Bull in filling or delivering such orders, Red Bull shall use its best efforts to notify Distributor of such rejection or delay as soon as practicable.

(2)     Make reasonable efforts to meet Distributor's requested delivery schedule in accordance with Distributor's delivery requests, provided the requested delivery schedule is commercially reasonable. In the event the Product is in limited supply or its availability is otherwise restricted, Red Bull shall have the right in its sole discretion and judgment to allocate the Product to and among Distributor and other Red Bull distributors.

(3)     Provide Distributor with reasonable quantities of such point-of-sale and other in-store product advertising materials as Red Bull has available for the Product, provided Distributor meets Red Bull's criteria for receiving and using those advertising materials.

(4)     Advise Distributor in advance of any national or local advertising programs conducted by Red Bull for the Product, and of Red Bull's promotional programs for the Product.

C.   Distributor shall:

(1)   Provide all proper distribution services for, develop the full potential for, and diligently sell, distribute, promote and merchandise the Product in all retail accounts in the Territory.

(2)   Buy the Product only from Red Bull, sell the Product only to retail accounts and not sell the Product outside the Territory, unless otherwise authorized in writing by two Red Bull officers. Notwithstanding anything to the contrary herein, Distributor agrees not to sell the Product to any retail account or any customer directly or indirectly by means of the Internet without the prior written consent of Red Bull.

(3)   Receive all Products purchased from Red Bull only at Distributor's warehouse(s) in the Territory and place those Products in such warehouse(s) upon receipt, unless alternate arrangements are approved in writing by two Red Bull officers.

(4)   Train, maintain and supervise, in accordance with standards that Red Bull may from time to time establish, a fully staffed van sales team exclusively dedicated to selling the Product via direct store delivery, with responsibility for sales to all retail accounts.

(5)   Cause its Product sales personnel and/or management to call on all retail accounts with such frequency as may be reasonably required by Red Bull from time to time.

(6)   Achieve and maintain Red Bull standards for shelf and cold box conditions, execute Red Bull promotional programs in accordance with Red Bull standards for point of-sale, floor display and other promotional materials, and otherwise carry out Red Bull's high quality merchandising standards. Distributor acknowledges that Red Bull standards for promotion, distribution and merchandising have been carefully developed and successfully used by Red Bull and its distributors to maximize sales of the Product not only for the present but also for the future. Distributor also agrees that failure to adhere to one or more of these standards could result in the eventual deterioration of the market position of the Product even though Distributor's current sales might be substantial and/or increasing.

(7)   Maintain in-stock conditions for the Product in all retail accounts and maintain warehouse inventories of the Product sufficient to avoid out-of-stock conditions.

(8)   Maintain and operate a prompt, effective and properly equipped delivery service.

(9)   Maintain sufficient inventories of point-of-sale, display and other advertising materials supplied by Red Bull to carry out Red Bull programs. Inventories of such materials must be maintained in good condition and kept in locked storage with properly controlled access. Distributor must (i) require its personnel to account for all electrical point of sale and refrigeration equipment, and (ii) have all retail accounts execute appropriate bailment agreements (in such form as approved by Red Bull) with regard to such equipment.

(10)   Maintain the financial capability necessary to achieve efficient and effective distribution of the Product. If requested by Red Bull from time to time, Distributor must send financial statements relevant to Red Bull. If requested, these must include a balance sheet, profit and loss statement and related accounting statements and such other financial information, including an auditor's report, as Red Bull may request. If Red Bull so requests, financial statements and supplemental financial information regarding the Product must be audited.

(11) Submit to Red Bull timely and accurate reports and information on depletions, inventories, display installations, point-of-sale, advertising and display materials and equipment, and such other market information as Red Bull may request.

(12) Allow Red Bull representatives reasonable inspection and review of Distributor's facilities and operations for the Product.

(13) Maintain and operate adequate warehouse facilities including appropriate first-in, first-out and monitoring procedures.

(14) Maintain the quality and integrity of the Product by, but not limited to, handling, storage and rotation of the Product in transportation, warehouse inventory and to the extent permitted by law, in all retail accounts in accordance with Red Bull's standards.

(15) Take no action that may damage the reputation of the Product or may impair the reputation or competitive position of Red Bull or the Product in the trade.

(16) Maintain and operate adequate data processing systems with appropriate procedures and controls.

(17) Timely pay Red Bull for all Product purchased from Red Bull, in accordance with terms and methods of payment established from time to time by Red Bull. A late charge of the lesser of (i) 1.5% per month, or (ii) the maximum rate permitted by applicable law, will be assessed on all past due amounts.

(18) Conduct its business in accordance with all applicable laws, rules and regulations.

(19) Not have any authority to and not purport to assume or create any obligations by or on behalf of Red Bull.

(20) Destroy promptly at Distributor's own expense any Product that becomes distressed merchandise as a result of Distributor's actions, omissions or neglect. "Distressed merchandise" means any Product that, in Red Bull's opinion, is damaged by age, freezing, excessive heat, mishandling, fire, flood or wreck or is in any other respect unsuitable for resale.

(21) Maintain adequate insurance on its inventory of the Product. This insurance must include a provision that, in the event of any insured loss, the insurer has no right and is not permitted to salvage any distressed merchandise. Upon Red Bull's request, Distributor must furnish evidence of such insurance.

(22) Not disclose, without the written consent of Red Bull, any statistical or other information about Distributor's purchases or sales of the Product except to Red Bull or, after giving Red Bull notice, as required by and in accordance with law.

(23) Not delegate in whole or in part any of its functions as a distributor, without prior written approval of two Red Bull officers.

(24) Notify Red Bull in writing immediately and in full of: any bankruptcy or insolvency proceedings involving Distributor or any owner of Distributor as a debtor; any assignment, as security or otherwise, for the benefit of any creditor of Distributor; any threatened or actual suspension, revocation or other impairment of any license or permit required by Distributor to distribute the Product; any proposed or actual delegation of its functions as a Distributor; any proposed, attempted or actual assignment or transfer of its rights and/or delegation of its obligations

*[handwritten at top: "D, such consent not being unreasonably withheld" with initials]*

under this Agreement, whether by merger, operation of law or in any other manner; any proposed or actual change whatsoever in its ownership, control or management, including its Product sales manager; and/or any distribution by Distributor of any "energy drink", except for products sold to Distributor by Red Bull or any energy drink sold to Distributor by other suppliers represented by Distributor as of the date of this Agreement.

        D.      Distributor acknowledges and agrees:

            (1)      that Distributor has not paid anything to or for the account of Red Bull for its appointment as a Red Bull distributor, and has no obligation to pay anything to or for the account of Red Bull for such appointment;

            (2)      that anything Distributor may have paid or given to acquire all or any part of any business or entity which formerly distributed the Product was not paid or given to or for the account of Red Bull or based on any representation or assurance of Red Bull or at the direction, suggestion or encouragement of Red Bull and was paid or given with full knowledge that any distributorship agreement with Red Bull is and was terminable by Red Bull in accordance with its terms and without any liability of Red Bull to pay compensation to Distributor or anyone else; and

            (3)      that all commitments and expenditures of Distributor in connection with the distribution, sale and promotion of the Product (including all dedicated sales personnel expenses) are and will be made by Distributor with the express understanding and knowledge that they are part of Distributor's on-going costs of doing business and that they do not give Distributor any right to distribute any products in any territory, or any right to continue to distribute the Product or any other right(s) whatsoever.

        E.      Proper distribution of the Product requires highly engaged promotion and sales service efforts by the ownership and management of Distributor. The parties agree that this Agreement is entered into by Red Bull in reliance upon and in consideration of the qualifications of the present ownership and management of Distributor. It is further agreed that Red Bull enters into this Agreement on the understanding that the present ownership will maintain ownership and control of Distributor and will be actively involved in the supervision of the business of Distributor and that the present management will continue to manage the operations of Distributor.

        F.      Distributor shall not sell, assign or transfer its rights or delegate its duties or obligations under this Agreement, by merger, operation of law or in any other manner, without the prior written consent of Red Bull which may be withheld in its sole discretion and Distributor acknowledges that any attempted sale, assignment, transfer or delegation shall be null and void and shall constitute a material breach of this Agreement. *[handwritten: "& not unreasonably withheld" with initials]*

        G.      Red Bull has attached, as <u>Exhibit "2"</u> to this Agreement, a form of FDA continuing guarantee designed to relieve Distributor from responsibility if the Product is determined to be adulterated or misbranded under the Food, Drug and Cosmetic Act. **EXCEPT AS OTHERWISE SET FORTH IN EXHIBIT 2, RED BULL DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PRODUCT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.**

        H.      Distributor shall, in accordance with instructions provided by Red Bull and/or policy statements concerning Product recall and withdrawal that Red Bull may issue from time to time, promptly implement any recall or withdrawal of the Product that may be requested by Red Bull. Distributor's costs incurred in connection with any such recall or withdrawal, including the cost of the Product and the reasonable cost of labor directly associated with the recall or withdrawal, shall be reimbursed to Distributor by Red Bull unless and except to the extent that the recall or withdrawal is

the result of Distributor's acts or omissions. In the event of a recall or withdrawal not resulting from Distributor's acts or omissions, such reimbursement shall be Distributor's sole and exclusive remedy, whether in contract, tort or otherwise, for any breach of Red Bull's obligations under this Agreement.

I. If the FDA changes the way in which it categorizes the Product or the nature of the claims that can be made about the Product, or if there are other changes to applicable laws or their interpretation that could adversely affect Red Bull's ability to import, advertise, distribute or sell the Product, Red Bull may terminate this Agreement without any liability to Distributor and shall not be responsible for any loss, cost, damage or expense suffered or incurred by Distributor as a result thereof.

J. Distributor acknowledges that (i) Red Bull is the registered owner and/or authorized licensee of all of the names, brand names, trademarks, trade names, marks, designs, trade dress and packaging associated with the Product (collectively, the "Marks"), and (ii) nothing contained herein shall give Distributor any right, title or interest in and to the Marks. Distributor agrees to (a) obtain prior approval and direction from Red Bull for any use of the Marks in any advertising or promotional materials not expressly authorized or furnished by Red Bull, (b) not do anything harmful to or inconsistent with Red Bull's rights or goodwill in the Marks, (c) assist Red Bull in protecting those rights and goodwill, including assigning to Red Bull any rights acquired by Distributor (if any) in any of the Marks either through registration or use, (d) not derive or assert any future rights against Red Bull and the Marks from the use of the Marks; (e) provide Red Bull with appropriate and immediate notification when it becomes aware of violations of a Mark and infringements of the product on the market in the Territory; and (f) not engage in any business or market any service or product under a name or mark which, in Red Bull's opinion, is confusingly similar to any Marks. Red Bull shall determine, at its sole discretion, whether to take action against any alleged infringement and Distributor shall cooperate with Red Bull, at Red Bull's expense, in the protection of the Marks and other proprietary rights in the Territory. Distributor also agrees not to do business under any name or designation associated with or similar to any Mark or otherwise used by Red Bull without prior written permission from two Red Bull officers or after termination of this agreement. Such written permission is required for, among other things, any use of a Mark or such a trade name, trademark or trade dress on Distributor's stationery or equipment or in any advertising of Distributor. Distributor agrees to never contest Red Bull's exclusive ownership and right to use or license the use of any Mark or any other trademark, trade name or trade dress otherwise used by Red Bull, during the term of this Agreement or in the future. The statements made herein shall refer to the marks covered by this Agreement and to similar trademarks as well as to all trademarks registered or used by Red Bull.

K. To secure all of the obligations of Distributor to Red Bull under this Agreement (the "Secured Obligations"), Distributor agrees as follows:

(1) Distributor hereby grants to Red Bull a security interest under the New York Uniform Commercial Code (the "New York UCC") in the following property, whether now owned by Distributor or acquired by Distributor in the future (the "Collateral"): (i) all Product sold and to be sold from time to time to Distributor by Red Bull; (ii) all accounts receivable or other rights to payment arising out of or related to the sale or other disposition of Product by Distributor; (iii) all records of Distributor related to Distributor's purchases and sales of Product; and (iv) all proceeds of the foregoing property in whatever form.

(2) Upon the execution of this Agreement, Distributor has executed and delivered to Red Bull UCC-1 Financing Statements, suitable for filing in all appropriate jurisdictions, covering the Collateral. Red Bull is authorized to file such Financing Statements in all places in which, in its sole opinion, such filing is appropriate to protect and perfect its rights.

(3) Each of the following events shall constitute an event of default with respect to the Secured Obligations ("Event of Default"): the failure of Distributor to pay when due any amount

payable by it to Red Bull pursuant to this Agreement; the failure of Distributor to perform any of its other obligations under this Agreement when such performance is due and the continuation of such failure for 15 days after written notice of such default is given to Distributor; the termination of this Agreement under Section II; the bankruptcy or insolvency of Distributor; and the substantial or total termination of the conduct of the business presently being conducted by Distributor.

(4) Upon the occurrence of an Event of Default, all Secured Obligations shall become immediately due and payable whether or not they were at that time otherwise due and payable in accordance with their terms, and Red Bull shall be entitled to all rights and remedies provided by applicable law, including the rights and remedies of a secured party under the New York UCC. Any notification required by Section 9-504 of the New York UCC shall be reasonable if given at least 10 days before the date of sale. Sale or other disposition of any Collateral shall be conclusively deemed commercially reasonable if made at a public sale which is advertised in a newspaper of general circulation in the area in which the Collateral is maintained, at least once each week for three successive weeks.

(5) Red Bull shall apply the cash proceeds actually received from any foreclosure, sale, lease, collection or other disposition of the Collateral as follows: first, to reasonable attorneys' fees and all expenses incurred by Red Bull in attempting to enforce this Agreement; second, to the discharge of the Secured Obligations, first to accrued but unpaid interest and then to principal; third, to the satisfaction of other security interests and liens of record which are inferior to the security interest created by this Agreement, in order of their priority; and fourth, to pay any remaining surplus to Distributor.

II.   TERMINATION

A.   The following are grounds for immediate termination of this Agreement, effective upon written notice:

(1) any change in the ownership, control or management (including the Product sales manager) of Distributor without written consent of Red Bull; *whose consent will not be unreasonably withheld*

(2) a breach by Distributor of any of the provisions of this Agreement, including without limitation the implementation of the Red Bull Van Teams;

(3) any material misrepresentation or any fraudulent conduct engaged in by Distributor in its dealings with Red Bull;

(4) any public offering of stock of Distributor in whole or in part;

(5) any insolvency, assignment for the benefit of creditors or bankruptcy proceeding commenced by, for or against Distributor;

(6) any suspension in excess of five (5) days or any revocation of a government license or permit necessary for Distributor to distribute the Product or for Red Bull to sell the Product to Distributor;

(7) any attempt by Distributor to assign or otherwise transfer its rights or delegate its duties or obligations under this Agreement in violation of Section I.F;

(8) any attachment, judicial or arbitration award or judicial lien is entered against Distributor or any of its assets; and/or

(9) upon failure to timely pay amounts due on an invoice in accordance with Section I. C (17), which failure is not cured within 15 business days of notice given by Red Bull; provided, however, that if Distributor fails, on at least three occasions in any given rolling twelve-month period, to timely pay amounts due on an invoice in accordance with Section I. C (17), Red Bull shall have the right to immediately terminate Distributor, whether or not any of such failures were cured within the cure period prescribed in this Section II. A (9).

B. In addition, this Agreement is terminable by either party, without cause, solely for its convenience, upon 30 days written notice to the other party. In the event of termination for convenience by Red Bull pursuant to this Section II.B within the first three years of this Agreement, and only in that event, Red Bull shall compensate the Distributor an amount equal to the lesser of (i) $8.00 times the number of cases of the Product sold by the Distributor during the twelve (12) month period prior to the effective date of termination or (ii) the sum of $500,000, in exchange for (a) the Distributor duly executing an agreement (in a form satisfactory to Red Bull) releasing and discharging Red Bull and its officers, directors, shareholders, agents and employees from any and all monetary claims, damages, losses, obligations and liabilities, known and unknown, arising out of or in any way relating to the relationship between Red Bull and Distributor and (b) Distributor fulfilling its obligations under Section II.D below. Red Bull and Distributor acknowledge and agree that any amounts paid to Distributor pursuant to this Section II.B shall be Distributor's sole and exclusive remedy (at law or in equity) in the event of termination by Red Bull pursuant to this Section II.B and that Red Bull shall not have any other liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any such termination pursuant to this Section II.B.

C. Upon either party giving written notice to the other party pursuant to Section II, Red Bull may immediately appoint other distributors in the Territory and/or make sales itself in the Territory without liability to Distributor. Except as agreed upon by the parties in Section II.B above, Distributor acknowledges and agrees that Red Bull shall not have any liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any such termination pursuant to Section II.

D. Upon any termination of this Agreement, Distributor must cease holding itself out to the public as a distributor of the Product, return to Red Bull all Red Bull advertising, point-of-sale and other promotional materials and equipment, transfer to Red Bull or Red Bull's designee all information regarding Distributor's sales of the Product, and pay immediately for any purchases from Red Bull made prior to such termination. Upon any termination of this Agreement, Distributor's rights under this Agreement shall accordingly terminate, but all duties and obligations of Distributor shall continue until fully satisfied or relieved. At Red Bull's option exercised by written notice to Distributor, Red Bull may purchase or cause another entity to purchase, and Distributor shall sell to Red Bull or Red Bull's designee, all Product in Distributor's inventory that are in salable condition, as determined by Red Bull, at the laid-in cost of those Products to Distributor.

E. At any time upon 30 days written notice to Distributor, Red Bull may remove any part of Distributor's Territory and appoint other distributors for the Product therein or make sales of the Product directly therein, all without any liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any such removal. At any time upon 30 days written notice to Red Bull, Distributor may cease distributing the Product in any part of its Territory, provided that in such event Red Bull may immediately appoint other distributors for the Product therein or make sales directly therein without any liability or obligations to Distributor as a result thereof. Any such removal of Territory or cessation of sale or distribution does not by itself terminate this Agreement.

III.   DISCHARGE AND RELEASE

Distributor and Red Bull hereby release and discharge each other and their respective officers, directors, shareholders, agents and employees from any and all monetary claims, damages, losses, obligations and liabilities (except for Distributor's obligations with respect to purchases of merchandise), known and unknown, that are not described in a written notice specifying the nature and amount of such claims, damages, losses, obligations or liabilities, and received by the adverse party within one year after such claims, damages, losses, obligations or liabilities first arose.  In consideration of each other's willingness to enter into this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Distributor and Red Bull further hereby release and discharge each other from any and all monetary claims, damages, losses, obligations and liabilities (except for Distributor's obligations with respect to purchases of merchandise), known and unknown, that may exist between them as of the date of this Agreement. In giving these releases and discharges to each other, Distributor and Red Bull each specifically waives its rights under Section 1542 of the California Civil Code (and under any other similar provision of any applicable law), which Section reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Red Bull and Distributor hereby acknowledge that the facts in respect of which their releases are given may hereafter be established or shown to be other than or different from the facts in that connection now known to either party or believed by any party to be true.  All parties hereto hereby expressly accept and assume the risk of the facts being established or shown to be so different and acknowledge that their releases shall be and remain in all respects effective and not subject to termination or rescission by reason of any such difference in facts.

IV.   WAIVER OF INCIDENTAL, SPECIAL, CONSEQUENTIAL AND PUNITIVE DAMAGES

**RED BULL SHALL NOT BE LIABLE FOR INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES SUFFERED, INCURRED OR CLAIMED BY DISTRIBUTOR FOR ANY REASON, WHETHER BASED IN CONTRACT, TORT OR OTHERWISE AND WHETHER OR NOT CAUSED BY RED BULL'S BREACH OF THIS AGREEMENT, NEGLIGENCE OR OTHER ACTIONS.**

V.   ENTIRE AGREEMENT AND NON-WAIVER

This Agreement sets forth the entire agreement of the parties regarding the subject matter of this Agreement, and supersedes all prior representations, agreements and understandings of any kind in regard to such subject matter. No agreements, commitments or understandings varying any term, provision, covenant or condition of this Agreement are binding upon either party unless made in writing, and signed by an officer of the Distributor and two officers of Red Bull. Without limiting the generality of the foregoing, Distributor acknowledges and agrees that Red Bull is not obligated to appoint Distributor as a Red Bull distributor for any products or in any territory other than as expressly stated in this Agreement. Distributor and Red Bull further agree that neither will make a claim at any time that this Agreement has been orally altered, modified or waived in any respect whatsoever. A failure to enforce any provision of this Agreement in any instance is not a waiver of such provision in the same instance or in any other instance.

VI.   GOVERNING LAW

THIS AGREEMENT IS ENTERED INTO UNDER THE LAWS OF THE STATE OF NEW YORK INCLUDING ITS CONFLICTS OF LAW RULES; ALL QUESTIONS

REGARDING THE AGREEMENT, INCLUDING BUT NOT LIMITED TO ITS VALIDITY, CONSTRUCTION, INTERPRETATION, BREACH AND DAMAGES FOR BREACH SHALL BE GOVERNED BY AND CONSTRUED THEREUNDER.

VII. <u>MANDATORY ARBITRATION</u>

Any claim, dispute or controversy arising between the parties in connection with, out of or in relation to this Agreement, or any breach or termination hereof, shall be settled by binding arbitration to the exclusion of the ordinary courts conducted by a three-person Arbitral Tribunal in New York City, New York in accordance with the rules of the American Arbitration Association then in effect, and judgment upon any award rendered may be entered in any court having jurisdiction over the parties or their assets. The losing party in the proceeding shall compensate the prevailing party for attorney's fees and the costs of arbitration. The arbitrators may determine the amount of said costs without taking any guidelines for fees or disbursements into consideration. In case a party prevails only partially, the arbitrators are authorized to award a proportionate amount of the attorney's fees and the cost of arbitration to such party. In any such arbitration, the arbitrators shall be required to apply and follow the terms and conditions of this Agreement and the governing law and shall not have the power to relieve either party from the application of any provision contained herein.

VIII. <u>NOTICES</u>

All notices required to be given by a party under this Agreement must be in writing, and must be hand delivered or mailed by certified or registered mail, postage prepaid, to the other party at its address set forth below, or such other address as such party may have designated in writing by notice to the other party from time to time. Notices are effective upon hand delivery or five (5) days after mailing, as the case may be.

IX. <u>GENERAL PROVISIONS</u>

A. The relationship created by this Agreement is that of independent contractors and the parties hereby acknowledge and agree that nothing herein shall be deemed to constitute Distributor as an agent, partner, joint venturer or franchisee of Red Bull. To the extent permitted by applicable law, Distributor hereby waives the benefit of any state or federal statutes relating to or dealing with the establishment and regulation of franchises.

B. Any terms contained in Distributor's purchase orders or similar documents which conflict with or are inconsistent with the terms and conditions of this Agreement shall not apply to any sale of the Product. No additional terms of sale shall apply to any sale of the Product other than those referred to or contained in this Agreement unless such terms are expressly accepted in writing by two officers of Red Bull in its order acknowledgment.

C. Distributor shall be responsible for the payment of all federal, state and local taxes that may be assessed against Distributor with regard to the distribution and sale of the Product or with regard to other Red Bull property in Distributor's possession. Distributor shall also be responsible for the payment of any federal, state or local sales or excise taxes on the sale and delivery of the Product to Distributor to the extent that such taxes are not included on Red Bull's invoices. At Red Bull's request, Distributor agrees to furnish Red Bull with a resale tax certificate.

D. Red Bull shall not be liable for its failure to perform hereunder due to contingencies beyond its reasonable control, including, but not limited to, strikes, riots, wars, fire, acts of God or acting in compliance with any law or government regulation.

E. This Agreement may not be amended, modified or rescinded except by a written agreement signed by an officer of the Distributor and two officers of Red Bull.

X. ACKNOWLEDGMENT OF REVIEW, REPRESENTATION OF AUTHORITY AND EFFECTIVE DATE

The undersigned acknowledge that they have each reviewed the terms of this Agreement, that they fully understand those terms and that they have had the opportunity to consult with their respective counsel concerning those terms. The undersigned represent that they are duly authorized to sign this Agreement. This Agreement shall not become effective until executed on behalf of each party by an officer(s) of such party and delivered to the other party.

Distributor:

THE BEVERAGE WORKS, INC.

By: *[signature]*
Title: Pres
Date: 3/15/00
Address: 1729 Hwy 34 Bldg #31
Farmingdale, NJ 07727

Red Bull:

RED BULL NORTH AMERICA, INC.

By: *[signature]*
Title: Executive Vice President
Date: 3/16/00
Address: 1453 3rd Street Promenade
Suite 420
Santa Monica, CA 90401

By: *[signature]*
Title: Executive Vice President
Date: 03/21/00
Address: 1453 3rd Street Promenade
Suite 420
Santa Monica, CA 90401

## EXHIBIT 1

### TERRITORY

The 5 boroughs of New York City, Long Island, Westchester County, New Jersey where covered by New York T.V. and Connecticut where covered by New York T.V.

## EXHIBIT 2

### FDA CONTINUING GUARANTEE

Each shipment or other delivery of the Product hereafter made by Red Bull to, or in the order of Distributor is guaranteed, as of the date of such shipment or delivery to Distributor, to be, on such date, not adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act, and not an article which may not, under the provisions of Sections 404, 505 or 512 of the Act, be introduced into interstate commerce. **EXCEPT AS OTHERWISE SET FORTH ABOVE, RED BULL DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PRODUCT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.**



Red Bull North America, Inc. / Legal Department

June 23, 2003

<u>VIA FEDEX</u>
Mr. Gerald Ponsiglione, Jr.
The Beverage Works
1709 Highway 34, Unit 6
Farmingdale, New Jersey 07727

Dear Mr. Ponsiglione, Jr.:

Please find enclosed a fully executed copy of the addendum to the distributor agreement for your records.

If you have any questions, please feel free to contact either your Red Bull field representative, or you may contact me directly at 310-393-4647.

Best regards,

Robert Sorensen

# FIRST ADDENDUM TO DISTRIBUTORSHIP AGREEMENT

Reference is made to the distributorship agreement by and between The Beverage Works, Inc. and Red Bull North America, Inc. ("Red Bull"), said agreement being dated on or about March 2000 (the "Distributorship Agreement").

Be it known, that for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree to the following:

Exhibit 1 of the Distributorship Agreement shall be deleted and replaced in its entirety by the following:

## "EXHIBIT 1

## TERRITORY

The five boroughs of New York City, Long Island and New Jersey where covered by New York T.V."

All other terms and provisions of the Distributorship Agreement shall remain in full force and effect.

The undersigned acknowledge that all parties have each reviewed this addendum to the Distributorship Agreement, and that they fully understand and agree to the modified terms.

Distributor:

THE BEVERAGE WORKS, INC.

By: _____
Title: _____
Date: 6/12/03
Address: 1729 Highway 34
Building #31
Farmingdale, NJ 07727

Red Bull:

RED BULL NORTH AMERICA INC.

By: _____
Title: Executive Vice President
Date: 6/20/03
Address: 2525 Colorado Avenue
Suite 320
Santa Monica, CA 90404

By: _____
Title: Executive Vice President
Date: 6/18/03
Address: 2525 Colorado Avenue
Suite 320
Santa Monica, CA 90404