## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE BEVERAGE WORKS, N.Y., INC.,<br><br>Plaintiff,<br><br>v.<br><br>RED BULL NORTH AMERICA, INC;<br><br>Defendant. | CASE NO.: 3:24-cv-05745 (RK)(BD) |

## DEFENDANT RED BULL NORTH AMERICA, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Ian Marx
Aaron Van Nostrand
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677

Jeffrey Greene
Kelly Pesce
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110

*Attorneys for Defendant*
*Red Bull North America, Inc.*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................i

TABLE OF AUTHORITIES .................................................................................ii

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ................................................................................3

   1.  The Distribution Agreement ..................................................................5

   2.  TBW is an Independent Business That Red Bull Does Not Control...............6

   3.  TBW's Poor Performance....................................................................10

   4.  Transition from TBW .........................................................................12

ARGUMENT ......................................................................................................16

   I.  LEGAL STANDARD.........................................................................16

   II.  TBW HAS NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF
      SUCCESS ON THE MERITS ............................................................18

     A.  TBW Does Not Maintain a New Jersey "Place of Business" .................19

     B.  There is no Community of Interest Between Red Bull and TBW ...........22

     C.  Even if the NJFPA Applies, Red Bull Had Good Cause to Terminate the
        Agreement .....................................................................................26

   III. TBW WILL NOT SUFFER ANY IRREPARABLE HARM IF AN
      INJUNCTION DOES NOT ISSUE AND HAS AN ADEQUATE REMEDY
      AT LAW ...........................................................................................27

     A.  TBW's Delay Is Grounds Alone to Deny This Motion ..........................27

     B.  Any Harm to TBW Is Compensable by Money Damages......................30

   IV. THE BALANCE OF HARMS TIPS DECIDEDLY IN RED BULL'S
      FAVOR ............................................................................................33

   V.  TBW HAS NOT SHOWN THAT THE PUBLIC INTEREST WILL BE
      SERVED BY AN INJUNCTION .........................................................36

   VI.  TBW MUST POST SECURITY IF AN INJUNCTION IS ISSUED........37

CONCLUSION ...................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Acierno v. New Castle Cty.*,
   40 F.3d 645 (3d Cir. 1994) ........................................................................17, 27

*Alboyacian v. BP Prods. N. Am.*,
   2011 U.S. Dist. LEXIS 134453 (D.N.J. Nov. 2, 2011) ......................................36

*Arthur Treacher's Franchisee Litig.*,
   689 F. 2d 1137 (3d Cir. 1982) ............................................................................31

*Associated Producers Co. v. Independence*,
   648 F. Supp. 1255 (W.D. Mo. 1986).................................................................32

*Atl. City Coin & Slot Serv. Co. v. IGT*,
   14 F. Supp. 2d 644 (D.N.J. 1998)......................................................................32

*Beilowitz v. GMC*,
   233 F. Supp. 2d 631 (D.N.J. 2002)....................................................................23

*Carlo C. Gelardi Corp. v. Miller Brewing Co.*,
   421 F. Supp. 233 (D.N.J. 1976).........................................................................33

*Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.*,
   944 F.2d 1131 (3d Cir. 1991) ............................................................................25

*Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.*,
   844 F.2d 117 (3d Cir. 1988) ........................................................................22, 25

*Cooper Distrib. Co. v. Amana Refrigeration, Inc.*,
   63 F.3d 262 (3d Cir. 1995) ................................................................................23

*Dunkin' Donuts v. Elkhatib*,
   2009 WL 2192573 (N.D. Ill. July 17, 2009) ...............................................30, 31

*Engines, Inc. v. MAN Engines & Components, Inc.*,
2010 U.S. Dist. LEXIS 76541 (D.N.J. July 29, 2010) ......................................22

*Fischer Thompson Beverages, Inc. v. Energy Brands Inc.*,
2007 U.S. Dist. LEXIS 83334 (D.N.J. Nov. 9, 2007) .................................19, 20

*Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*,
847 F.2d 100 (3d Cir. 1988) ................................................................17, 31, 37

*Frazier v. Kuhn*,
2024 U.S. Dist. LEXIS 50166 (D.N.J. March 20, 2024)..................................18

*Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*,
263 F.3d 296 (3d Cir. 2001) ............................................................................26

*Graceway Pharm., LLC v. Perrigo Co.*,
697 F. Supp. 2d 600 (D.N.J. 2010)...................................................................28

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*
882 F.2d 797 (3d Cir. 1989) ..........................................................27, 31, 32, 37

*Lawmen Supply Co. of New Jersey v. Glock, Inc.*,
330 F. Supp. 3d 1020 (D.N.J. 2018)...........................................................18, 19

*LexJet, LLC v. Big Dog Media Solutions, LLC*,
2014 WL 7642095 (M.D. Fla. 2014).................................................................34

*Liberty Sales Assocs., Inc. v. Dow Corning Corp.*,
816 F. Supp. 1004 (D.N.J. 1993)..........................................................20, 21, 22

*Manpower Inc. v. Mason*,
377 F. Supp. 2d 672 (E.D. Wis. 2005) ........................................................32, 33

*MNI Mgt., Inc. v. Wine King, LLC*,
542 F. Supp. 2d 389 (D.N.J. 2008)...................................................................34

*Money Marketing v. Silver Aspen, Inc.*,
2006 WL 8457663 (D.N.J. June 9, 2006)..........................................................36

*Munaf v. Geren*,
    553 U.S. 674 (2008)...............................................................................16, 17

*N.J. Assoc. of Health Care Facilities, Inc. v. Gibbs*,
    838 F. Supp. 881 (D.N.J. 1993).............................................................27, 28

*Ocean City Express Co. v. Atlas Van Lines, Inc.*,
    46 F. Supp. 3d 503 (D.N.J. 2014)..................................................................22

*Orologio of Short Hills Inc. v. Swatch Grp. (U.S.)*,
    653 F. App'x 134 (3d Cir. 2016) ..................................................................22

*Punnett v. Carter*,
    621 F.2d 578 (3d Cir. 1980) .........................................................................17

*Reedco, Inc. v. Hoffman-La Roche, Inc.*,
    667 F. Supp. 1072 (D.N.J. 1987)..................................................................28

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2d Cir. 1970) .......................................................................32

*Spiegel v. City of Houston*,
    636 F.2d 997 (5th Cir. 1981) ........................................................................30

*S R Corp. v. Jiffy Lube Intern., Inc.*,
    968 F.2d 371 (3d Cir. 1992) .........................................................................17

*Super 8 Motels, Inc. v. Sai Krupa Victoria, Inc.*,
    2006 WL 2830965 (D.N.J. Sept. 29, 2006)..................................................35

*Terzian v. Montclair Hosp., LLC*,
    2023 U.S. Dist. LEXIS 41562 (D.N.J. March 10, 2023)...............................17

*Warner Lambert Co. v. McCrory's Corp.*,
    718 F. Supp. 389 (D.N.J. 1989).................................................................27, 28

*Watchung Spring Water Co. v. Nestle Waters N. Am. Inc.*,
    588 Fed. Appx. 197 (3d Cir. 2014).............................................................19, 20

*WindSoft Inc. v. Intercon Sys. (1988) Ltd.*,
    1995 WL 903453 (D.N.J. Sept. 12, 1995) ..........................................................36

*W.R. Grace & Co. v. Local Union 759, Int'l Union of Un. Rubber,*
    *Corp. Linoleum and Plastic Worker*s,
    461 U.S. 757 (1983) ..........................................................................................37

*Zambelli Fireworks Mfg. Co. v. Wood*,
    592 F.3d 412 (3d Cir. 2010) .........................................................................37, 38

**State Cases**

*DeLuca v. Allstate Ins. Co*.,
    2011 N.J. Super. Unpub. LEXIS 3140 (Ch. Div. 2011) ..............................25, 26

*Instructional Sys., Inc. v. Computer Curriculum Corp*.,
    130 N.J. 324 (1992) .............................................................................19, 20, 23

*Westfield Centr. Serv., Inc. v. Cities Serv. Oil. Co*.,
    86 N.J. 453 (1981) ........................................................................................29, 31

**State Statutes**

N.J.S.A. § 56:10-3(f) ...............................................................................................19

N.J.S.A. § 56:10-4(a)(1) .........................................................................................19

**Other Authorities**

Garner, 1 *Franch. & Distr. Law & Prac*. § 5:29 (WL 2010) ..................................22

Defendant Red Bull North America, Inc. ("Red Bull") hereby files this response in opposition to Plaintiff The Beverage Works, N.Y., Inc.'s ("TBW") motion for a preliminary injunction and a temporary restraining order ("Motion").

## PRELIMINARY STATEMENT

This is not an "emergency." TBW has known since March 19, 2024 that the parties' non-exclusive distribution agreement that allowed TBW to distribute Red Bull products in New York and New Jersey (the "Territory") would terminate effective June 2, 2024. After Red Bull notified TBW of the termination, the parties worked together on a transition plan. That plan was well underway on April 30 when – **six weeks** after receiving the termination notice – TBW surprised Red Bull with its Motion. This delay alone is sufficient reason to deny the Motion.

TBW is not clear on what it wants from an injunction, and for good reason. The status quo is that TBW will close on June 2 and Red Bull will take over distribution in the Territory on June 3. In the six weeks between the termination notice and the motion, both parties operated on this assumption. Among other things, Red Bull notified over 80 accounts and 5,000 stores in the Territory that Red Bull would be the new distributor, hired dozens of employees, signed leases, built out warehouse space, shipped product, and procured hundreds of vehicles. Red Bull is now ready for a complete transition on June 3.

TBW, meanwhile, has cooperated in and encouraged these efforts while simultaneously winding down its operations – telling its employees and customers that they will not be a Red Bull distributor as of June 2, loading up dozens of truckloads of promotional materials for Red Bull to pick up, preparing to offload inventory to Red Bull, and failing to service its customers, among other things. It is now Red Bull – not TBW – that will be harmed if an injunction is entered. Red Bull could lose business, goodwill, and potentially customers, some of which it may not be able to recover. This Motion is an effort to: (1) alter the status quo, rather than maintain it, as a preliminary injunction is designed to do; and (2) gain leverage before the parties' May 28, 2024 mediation. Against this backdrop, the balance of hardships decidedly tips in Red Bull's favor.

Coupled with TBW's failure to demonstrate irreparable harm or that the equities are in its favor, TBW also cannot show a likelihood of success on the merits of its New Jersey Franchise Practices Act ("NJFPA") claim (the sole substantive claim in its Complaint). TBW fails a threshold test for that statute to apply: TBW's warehouses in New Jersey do not qualify as a New Jersey "place of business" and the business relationship does not require the types of franchise-specific investments to meet the "community of interest" requirement. Moreover, even under the NJFPA's inapplicable statutory framework, Red Bull has good cause to terminate a

chronically underperforming distributor that has not kept pace with other Red Bull distributors in the largest market in the country.

Finally, although TBW is not entitled to injunctive relief, it is notable that TBW has omitted any mention of the mandatory Rule 65(c) security for its proposed injunction. TBW is asking this Court to stop Red Bull's transition plan, which is almost complete, in its tracks. The harm Red Bull will suffer if the injunction issues is substantial. If an injunction issues (it should not), a bond of no less than $10,000,000 is required to protect Red Bull from being wrongfully enjoined.

## **FACTUAL BACKGROUND**

Red Bull was formed in 1997 as a subsidiary of Red Bull GmBH in Austria. Red Bull is responsible for all sales and marketing activities related to Red Bull Energy Drinks across the United States and Canada. Over the last nearly 25 years, Red Bull created the energy drink category in the United States. In addition to establishing the category, and despite fierce competition, the Red Bull brand has been successful in establishing itself as the number one energy drink sold in the United States on sales dollar volume and maintaining that position. Declaration of Bill Connors ("Connors Decl."), ¶ 2.

Red Bull distributes Red Bull Energy Drinks through its affiliate distribution company and through third-party distributors. Typically, Red Bull's distributors have non-exclusive rights to sell Red Bull Energy Drinks in specific geographic

territories. Many of Red Bull's distributors that started as nascent start-up businesses have adapted and modernized their organizational structures, business strategies and practices to reflect Red Bull's market position. This evolution has been instrumental in driving Red Bull's growth across the United States. Connors Decl., ¶ 3.

TBW has been distributing Red Bull products in New York and New Jersey since 2000. TBW has two locations in New Jersey and three locations in New York. TBW does not currently distribute any products other than Red Bull Energy Drinks, although it is not prohibited from doing so. Connors Decl., ¶¶ 8, 64.

TBW has not kept pace with the rest of Red Bull's United States business. In the last 10 years, TBW's sales volume performance has been a drag on the total United States business (identified below as "RBNA") in every single year, including negative sales performance in years 2016, 2017, 2020, 2022, and 2023:

| YOY Growth | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RBNA | | 5.0% | 8.2% | 2.3% | 3.9% | 4.5% | 9.0% | 10.0% | 25.0% | 6.9% | 2.2% |
| EABU | | 4.8% | 2.3% | 0.8% | 2.6% | 4.1% | 7.8% | 5.6% | 24.1% | 3.6% | 0.3% |
| The Beverage Works | | 4.9% | 4.1% | -3.5% | 3.0% | 2.6% | 7.5% | 5.4% | 21.4% | -2.0% | -6.6% |

Connors Decl., ¶ 4.

For many years, Red Bull was able to maintain a strong market position in the New York region. This was more a result of competitive brands being unsuccessful in their efforts to gain a foothold in New York than of TBW's performance. This position of strength has eroded over recent years as a host of new competitive brands have gained popularity. Connors Decl., ¶ 5.

1.   **The Distribution Agreement**

This dispute arises out of a July 11, 2008, Distribution Agreement between Red Bull and TBW (the "Agreement") whereby TBW agreed to distribute Red Bull products in a defined territory in New York and New Jersey. Complaint, Exhibit A. Per the Agreement, TBW was appointed as an authorized distributor on a nonexclusive basis with the right to purchase specified products from Red Bull to market, distribute, and sell within the Territory. *Id.* at §IIA. Essentially, TBW purchases Red Bull products from Red Bull and sells those products to retail customers in its Territory. The Territory is (1) "the five boroughs of New York City and Long Island," and (2) the following counties in New Jersey: "Bergen, Burlington, Essex, Hudson, Hunterdon, Mercer, Middlesex, Morris, Monmouth, Ocean, Passaic, Somerset, Sussex, Union, and Warren." *Id.* at Schedule B.

The Agreement is not for a defined term; rather it ends "on the date that this Agreement terminates." *Id.* at §VII.A. Pertinent here, the Agreement expressly provides that either party can terminate the Agreement at any time without cause:

> The parties hereby wish to acknowledge and reaffirm their intention to create an "at-will" relationship. The parties furthermore acknowledge and agree that: (i) the Term of this Agreement is not for a fixed period, or minimum period, of time, and (ii) at any time either party may terminate this Agreement without cause in accordance with the procedures in this Section. Each party hereby accepts the risk that the other party may terminate this Agreement at any time without cause in accordance with this section.

*Id.* at §VII.B.1. Not only was this provision agreed upon, but it was also separately

initialed by the parties. No other provision of the Agreement was separately initialed.

TBW's right to distribute Red Bull products has always been nonexclusive. Red Bull may "sell Product to any Person in, and outside of, the Territory including, without limitation, to Accounts in the Territory." *Id.* at §II.C.1. The Agreement also allowed TBW to sell products other than "Competitive Products." *Id.* at §II.D.3. TBW also expressly agreed that it was not a franchisee of Red Bull. *Id.* at §XIII.A.1.

### 2. <u>TBW is an Independent Business That Red Bull Does Not Control</u>

TBW contends that Red Bull controls almost every aspect of TBW's business. That position is contrary not only to the Agreement but also with the manner in which the businesses interact on a regular basis.

**<u>TBW Can Sell Other Products</u>**:  Although TBW is prohibited from selling products that compete with Red Bull (i.e., other energy drinks), there is no prohibition on TBW selling non-competitive products. TBW does not need to seek permission from Red Bull to sell non-competitive products. Red Bull would, however, need to ensure that, per the Distribution Agreement, TBW was devoting adequate resources to the sale of Red Bull products. Connors Decl., ¶¶ 64-65.

**<u>TBW Made its Own Personnel Decisions</u>**: Red Bull did not control TBW's personnel decisions. In 2014-15, Red Bull suggested that TBW focus on succession planning and structure changes that would help it transition from a small business to a true corporate business. Red Bull did not, as TBW contends, mandate that TBW

6

hire a general manager, recommend people, or review resumes. Red Bull has no such authority. TBW agreed with Red Bull's suggestion that it hire a general manager. Connors Decl., ¶¶ 46-47.

**Red Bull Provided Training Resources, But They Were Not Mandatory**: Red Bull provides training materials and online modules to its distributors. These training efforts are for the purpose of sharing proven strategies across Red Bull's sales network. These training efforts also alleviate the cost and burden on Red Bull's distributors to train sales personnel themselves. While Red Bull encourages its distributors to have its employees participate in trainings and keeps track of who completes the modules, Red Bull does not require its distributors' employees to complete these trainings. TBW has specifically requested that Red Bull send its training team to New Jersey to conduct trainings, as it did in Fall 2023 when, at TBW's request, Red Bull sent a team of people to Red Bull Arena to conduct a two-day training session for TBW's employees. Red Bull organized and paid for these sessions at TBW's request and solely for the benefit of TBW and its employees. Connors Decl., ¶¶ 48-50.

**Red Bull Provides TBW With Ready-Made Programs to Secure Business From Customers of All Sizes**: While Red Bull negotiates national contracts with Key Accounts (i.e., national or regional chain stores such as Target, Walmart, CVS, Walgreens, 7-Eleven and Wawa), TBW is free to negotiate its own sales terms with

its other customers. The Key Accounts generally will not negotiate with distributors or suppliers on a regional or store-by-store basis. Rather, these accounts only will negotiate with a single supplier, with uniform terms (including pricing) throughout their networks, to maintain consistency and to maximize economies of scale. In return, Red Bull is able to negotiate beneficial terms, such as favorable product placement, to the benefit of Red Bull's network. Thus, while TBW does not have the ability to negotiate prices with Key Accounts, Red Bull essentially gift wraps these customers to its distributors without its distributors having to expend the resources to establish relationships and beneficial purchasing and placement terms with these huge retailers.[1] Connors Decl., ¶¶ 56-57.

**Marketing and Promotion of Red Bull Products**:  Red Bull expends millions of dollars every year in its own efforts to market the brand. This includes television and radio advertisements, internet ads, sponsorships of events, concert series and sports teams (including a professional soccer team, the New York Red

---

[1] Red Bull also has developed a VIP Program that applies to independent or "mom and pop" retailers. The VIP Program is designed for Red Bull distributors to offer to independent retailers on an individual basis. TBW is not required to offer the VIP Program to its independent customers. Red Bull does not negotiate the prices at which TBW sells to VIP Program accounts; TBW negotiates those prices. In 2023, Red Bull developed a VIP Program specifically to support TBW. TBW's Territory includes New York City, and there are some unique characteristics of the retail locations in the City, including smaller footprints and other spacing issues. Red Bull developed ideas such as open-air coolers and custom shelves that would appeal to retailers in the City. This initiative – purely for the benefit of TBW – cost Red Bull several hundred thousand dollars. Connors Decl., ¶¶ 58-60.

Bulls, that trains in TBW's former Territory), and billboards. Red Bull does not ask its distributors to contribute to those extensive marketing efforts. But those activities are an enormous benefit to Red Bull's distributors. Red Bull's marketing team also spends extensive time and resources in developing marketing and promotional strategies that it provides to its distributors like TBW. These strategies are designed to promote the brand as a whole and have the added benefit of alleviating the burden on TBW to develop its own strategies and materials. That results in an enormous cost savings for TBW. Red Bull highly encourages its distributors to use its tried and tested marketing strategies, but they are not mandatory. Red Bull keeps track of the extent to which its distributors use the marketing strategies and materials. The purpose of that record keeping is not punitive but rather to assess how successful the marketing strategies and materials are in the real world and to facilitate a discussion – particularly in the case of TBW – of the reasons for suboptimal sales figures. Connors Decl., ¶¶ 52-54.

**TBW's Use of Red Bull's Trademarks**:  Other than the van wrappings, Red Bull did not require TBW to purchase decorations, clothing or other merchandise with the Red Bull logos. TBW purchased its own clothing for its employees with its own logos. As TBW admits, it was "encouraged" to "Red Bullize" its offices; those efforts were not mandatory. Connors Decl., ¶¶ 40-41.

TBW acknowledges that it is responsible for its own business strategies and

operations. In a presentation prepared by TBW that TBW presented to Red Bull in December 2023, TBW details **its own plans** for personnel, training, marketing strategies, sales strategies, etc. At no point does TBW say that these decisions were imposed or controlled by Red Bull. Connors Decl., Exhibit 1.

### 3.    <u>TBW's Poor Performance</u>

As Red Bull has experienced extraordinary growth since 2000, TBW unfortunately has not grown on a similar trajectory, nor has it appropriately modernized or adapted to changing market conditions, as other third-party distributors have done. Since 2000, Red Bull has moved from an "up and comer" in the beverage industry to a leader in the beverage and energy drink market. Similarly, many of Red Bull's distributors that – like TBW – started as nascent start-up businesses have adapted and modernized their organizational structures and business strategies and practices to reflect Red Bull's market position. Connors Decl., ¶ 9-10.

TBW has not. TBW's organizational leadership structure is opaque, with unclear hierarchy and antiquated practices. TBW has also done very little to modernize its warehouse space, in some cases operating out of the same warehouse spaces for over 20 years. TBW also still operates with a cash sales system when most other distributors have transitioned to cashless systems. Connors Decl., ¶ 10.

Throughout the past several years, Red Bull has suggested strategies to TBW to modernize its structure and practices to mirror developments in the industry and

other more successful Red Bull distributors. For example, in 2014-15, Red Bull suggested that TBW focus on succession planning and structure changes that would help it transition from a small business to a business that could adapt to market and customer demands.  TBW agreed with some suggestions (like bringing in an outside influence to level up the small business) and disagreed with others (like the move away from cash). Connors Decl., ¶ 11.

TBW did not listen to much of Red Bull's advice, and TBW has been one of the poorest performing Red Bull distributors over the last 10 years. TBW currently has the lowest growth rate of any Red Bull distributor in the region and is ranked 20 out of 21 nationally for volume and distribution performance. As of the end of 2023, TBW ranked close to the bottom in other important metrics. Connors Decl., ¶¶ 12-13. TBW acknowledged its own shortcomings. In a presentation prepared by TBW that TBW presented to Red Bull in December 2023, TBW admitted that its volume has declined by 400,000 units since 2021 and that its costs and expenses are outpacing volume growth. Connors Decl., Exhibit 1 at 3-4.  This decline is consistent across almost all customer channels. *Id.* at 5.

Because the New York/New Jersey market is Red Bull's largest market in the country, Red Bull determined that – after 10 years of declining performance – it was time to part ways with TBW and bring distribution in the region in house, through Red Bull's affiliate Red Bull Distribution Company, Inc. ("RBDC"). This decision

was not taken lightly. Red Bull made the decision only after years of working with TBW to improve its performance. Despite Red Bull's efforts, TBW's performance metrics still lagged. Given the growing competition in the energy drink market, now was the time to make a change to prevent Red Bull from losing its prominent position in the market. Connors Decl., ¶ 15.

### 4. **Transition from TBW**

Red Bull recognized that it would take some time for TBW to wind down its operations. Red Bull provided TBW 77 days' notice (from March 19 to June 2) before the termination would become effective. In the weeks following the March 19 termination notice, TBW's principals did not seek to halt the June 2 termination. Rather, the focus of TBW was on securing a separation payment from Red Bull. The discussions between Red Bull and TBW were focused on transitioning leases, employees, and other wind down costs. In reliance on those discussions, Red Bull continued investing into the transition, understanding that TBW would be seeking assistance with monetary costs to wind down the business. Connors Decl., ¶¶ 17-19.

Red Bull has dedicated millions of dollars and substantial resources since March 19 to facilitate the transition from TBW to Red Bull in the Territory, working closely with TBW's team on a smooth transition for its employees and customers. Connors Decl., ¶ 20; Declaration of Scott Mangold ("Mangold Decl."), ¶ 4. Until very recently, TBW has cooperated fully in Red Bull's transition efforts and has

sought Red Bull's assistance in winding down TBW's operations. Connors Decl., ¶

20. Red Bull has taken the following steps over the last 7 weeks:

     a.    Extended offers to 74 employees, all of whom will have started work by the June 3 transition. Roles range from merchandisers and sales trainees to the director level. Red Bull has conducted hundreds of interviews and is actively interviewing for more employees. Some employees have already relocated to the Territory.

     b.    Notified 85 retailers with 5,316 stores (referred to as Key Accounts) that Red Bull will be taking over its distribution in the Territory on June 3.

     c.    Signed 7 leases for warehouses in the Territory and worked on site design, construction, and furniture. Red Bull has commenced build out or infrastructure work at three of the locations, and the other locations are being built out by the landlords. To service the warehouses, Red Bull has purchased approximately $500,000 in equipment, such as hand trucks, pallet jacks, forklifts, floor scrubbers, operational supplies, cabinets, racking, and uniforms.

     d.    Redirected shipments of Red Bull product and point of sale ("POS") promotion materials to Red Bull. This includes moving 25 truckloads of POS out of TBW and into new Red Bull locations at TBW's request.

     e.    Red Bull has received approximately 300,000 cases of Red Bull product with approximately 200,000 more cases en route. As of May 13, 2024, Red Bull has received 142 truckloads at its 7 warehouses in the Territory. By June 3, 2024, Red Bull will have received 169 truckloads in total.

     f.    Sent roughly 100 employees to the Territory to support the launch.

     g.    Ordered, upfitted, and painted over 250 vehicles (some of which are being stored in Atlanta and are currently being moved to the Territory).

Mangold Decl., ¶¶ 6-23. To date, RBDC has allocated tens of millions of dollars to the transition. Mangold Decl., ¶ 4.

In contrast to Red Bull's efforts to ramp up operations, TBW has shifted its focus over the last six weeks to winding down its operations in time for the June 3 transition. In doing so, TBW has consistently messaged to its employees and customers that it will stop being a Red Bull distributor as of June 2, 2024. In none of those communications did TBW disclose or even indicate that it intended to challenge or push back the transition date through court proceedings. Connors Decl., ¶ 21. Examples of TBW's efforts to wind down operations include:

    a.    On April 12, 2024, TBW notified all of its employees that Red Bull had terminated the Agreement and would be taking over distribution in TBW's Territory effective June 3, 2024. Connors Decl., ¶ 21(a).

    b.    That same day, TBW informed its employees that Red Bull would start formal branded recruitment efforts on April 15, 2024. TBW knew that some of its employees started applying to work with Red Bull, and TBW did not object. Connors Decl., ¶ 21(b). TBW affirmatively has sent Red Bull contact information for several of its employees who want to join Red Bull. Mangold Decl., Exhibit 1-4.

    c.    Trade press (Beverage Business Insights) also announced the termination on April 12, 2024. Connors Decl., Exhibit 2. TBW issued no communication to refute the story. Connors Decl., ¶ 21(c).

    d.    Only after confirming that TBW had notified its employees the contract with Red Bull was terminated effective June 2, 2024, and that Red Bull was taking over and would be posting roles on April 15, 2024, Red Bull notified its Key Account customers of the transition in order to meet customer requirements. This included 85 retailers with 5,316 stores. Red Bull had informed TBW it would notify customers on this date, and TBW did not object. Connors Decl., ¶ 21(d).

    e.    On April 19, 2024, TBW's VP of Operations acknowledged that "manpower is tight and expected to decrease as employees move on." Connors Decl., Exhibit 3.

f.      By April 20, 2024, TBW was already informing a customer it could not sign up a new account because it would no longer be supplying Red Bull. Connors Decl., Exhibit 4.

g.      On April 26, 2024, TBW's VP of Operations rushed Red Bull to pick up items from its facilities because Plaintiff is "shutting down 6 facilities." Connors Decl., Exhibit 5.

h.      On April 30, 2024 – the day Plaintiff filed its Motion – a Director of TBW who oversees sales to national and regional accounts sent an email to a buyer of a grocery chain affirming that it would no longer be distributing Red Bull:  "I wanted to formally inform you that The Beverage Works will no longer be distributing Red Bull in the NY Region as of 6/3. RBDC will be taking over on that date." Connors Decl., Exhibit 6.

i.      TBW has shipped 25 truckloads of POS materials to Red Bull's new locations in the Territory. Red Bull has also, at TBW's request, rented dumpsters for TBW to discard old POS and reimbursed TBW for additional pallets for items like unboxed coolers. Red Bull agreed to reimburse TBW for the time its crews spent palletizing POS. Mangold Decl., ¶ 25.

Given all the steps TBW has taken to wind down its operations, and the investments and efforts that Red Bull has made to ramp up, it is already a foregone conclusion that the transition will happen on June 3, 2024. TBW will no longer have the employees, warehouse space, infrastructure, POS promotional materials, or customers to continue selling Red Bull products as of June 3, 2024. Red Bull views TBW's court filing as an effort to attempt to bolster its negotiating position ahead of the May 28, 2024 mediation, rather than a legitimate plea to allow TBW to continue to operate as a Red Bull distributor. Connors Decl., ¶ 23; Mangold Decl. ¶ 24.

TBW is already showing that it is unable to continue servicing customers:

a.     On May 9, 2024, Red Bull received an email from a Walmart – an obviously important customer in the Territory – in Peekskill, New York that their coolers and shelves were empty with Red Bull products for the entire week. Connors Decl., Exhibit 7.

b.     On May 9, 2024, Red Bull received an email from Stewart's Shops that their store in Kingston, New York was completely out of Red Bull products and that TBW had not made any deliveries since April 24, 2024. During that delivery, the TBW driver told the store that "they were going our [sic] of business so she shouldn't expect anyone else to come back." Connors Decl., Exhibit 8.

c.     On May 14, 2024, Red Bull received an email from a Walgreens store in Basking Ridge, New Jersey stating that they "aren't receiving weekly shipments to our store as our system says we should be receiving. We are supposed to receive deliveries every Monday but we haven't seen a Red Bull delivery in almost a month.  There have been distribution issues over the past two or three months." Connors Decl., Exhibit 9.

After receiving the emails above, Red Bull was concerned and visited stores in the Territory to make sure they were still being serviced.  On May 14 and 15, Red Bull saw significant service issues, including out of stock product, shelf space being ceded to competitors, and the planogram being ignored. Connors Decl., ¶¶ 26-27. Given the notifications that already have been sent to thousands of retail locations in the Territory, allowing TBW to continue to operate will cause massive customer confusion and, potentially, a loss of customers. Connors Decl., ¶ 24;

## ARGUMENT

## I.     LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy,' it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal cites

omitted). As it "should be granted only in limited circumstances," a Court should deny preliminary injunctive relief unless TBW demonstrates clear entitlement to such exceptional relief. *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

When ruling on a motion for a preliminary injunction, the court considers four factors: (1) the likelihood that the movant will prevail on the merits; (2) the extent to which the movant is being irreparably harmed; (3) the balance of the equities; and (4) the public interest. *S R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 374 (3d Cir. 1992). "All four factors should favor preliminary relief before the injunction will issue." *Id.*

"The primary purpose of a preliminary injunction is the maintenance of the status quo until a decision on the merits of a case is rendered. Where, as here, the movant requests to alter the status quo, that party faces particular scrutiny under a heavy burden." *Terzian v. Montclair Hosp., LLC*, 2023 U.S. Dist. LEXIS 41562, *8 (D.N.J. March 10, 2023) (citing *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994), and *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)). Here, the status quo is that the Agreement has been terminated. Red Bull already has undertaken extensive efforts to step in and distribute Red Bull products in the Territory beginning June 3, and those transition efforts are nearly complete. In the meantime, TBW has also been winding down its operations. TBW seeks to alter the status quo

by requiring Red Bull to delay the transition to some undefined point after June 3, jeopardizing Red Bull's substantial efforts to ramp up operations in the Territory. Any injunction undoubtedly will cause confusion on the part of retailers who have already been informed that TBW will no longer be distributing Red Bull products, and will cause significant harm and disruption to the large group of employees Red Bull already has hired to service the Territory. TBW fails to meet its "heavy burden" of proving that such an injunction is appropriate.

## II.   TBW HAS NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

TBW's case rises and falls with a determination as to whether the NJFPA applies to the relationship between TBW and Red Bull. It does not, because TBW is not a franchisee of Red Bull as that term is defined in the statute. The facts heavily weigh in favor of a finding that TBW has not demonstrated a likelihood of success on the application of the NJFPA. At the very least, there are substantial factual disputes as to the application of the NJFPA, making preliminary injunctive relief particularly inappropriate. *Frazier v. Kuhn*, 2024 U.S. Dist. LEXIS 50166, *6 (D.N.J. March 20, 2024) ("A preliminary injunction also should not be issued where material issues of fact are in dispute.").

To be considered a "franchise" under the NJFPA, TBW will need to establish that: (1) there is a community of interest between TBW and Red Bull; (2) that Red Bull granted a license to TBW; and (3) the parties contemplated that TBW would

maintain a place of business in New Jersey. *Lawmen Supply Co. of New Jersey v. Glock, Inc*., 330 F. Supp. 3d 1020, 1031 (D.N.J. 2018). Red Bull addresses certain of these requirements in turn.[2]

### A.     TBW Does Not Maintain a New Jersey "Place of Business"

The NJFPA applies to a franchise only if "the performance of [the business] contemplates or requires the franchisee to establish or maintain a place of business within the state of New Jersey." N.J.S.A. 56:10-4(a)(1). A "place of business" is

> a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle, except that with respect to persons who do not make a majority of their sales directly to consumers, "place of business" means a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services, or an office or a warehouse from which franchisee personnel visit or call upon customers or from which the franchisor's goods are delivered to customers.

N.J.S.A. 56:10-3(f). "[T]o satisfy the place of business requirement, 'there must be a sales location in New Jersey. Mere distribution through an office or warehouse would not qualify.'" *Watchung Spring Water Co. v. Nestle Waters N. Am. Inc*., 588 Fed. Appx. 197, 198 (3d Cir. 2014) (quoting *Instructional Sys., Inc. v. Computer Curriculum Corp*., 130 N.J. 324 (1992)), and citing *Fischer Thompson Beverages,*

---

[2] For purposes of this motion only, and without waiving any rights, Red Bull assumes that a license was granted to TBW per the terms of the Agreement.

*Inc. v. Energy Brands Inc*., 2007 U.S. Dist. LEXIS 83334 (D.N.J. Nov. 9, 2007) ("[T]he 'place of business' requirement would at least require some substantial level of marketing to the customer or other sales-related interplay with customers at the location.")). "Simply making telephone sales calls from an office will not convert that office into a sales location within the meaning of the Act." *Liberty Sales Assocs., Inc. v. Dow Corning Corp*., 816 F. Supp. 1004, 1009 (D.N.J. 1993).

TBW has not demonstrated a likelihood of success on the "place of business" element. The Agreement does not require TBW to have any warehouse or facility in New Jersey. The only requirement is that TBW maintain a warehouse somewhere in the Territory, which could be New York or New Jersey. Agreement, §§IV.B. and I.K. TBW has two locations in New Jersey and three locations in New York. While TBW claims its "corporate office" is in New Jersey, it actually is a New York corporation. Complaint, ¶ 20.

In Red Bull's experience working with TBW for two decades, TBW uses its facilities in New Jersey for general administrative and warehouse/distribution purposes. TBW does not offer Red Bull product for sale from its New Jersey facilities. That is, a customer cannot walk into TBW's facilities and purchase a can or case of Red Bull. Rather, TBW's sales are done almost exclusively in retail locations, either by presale or by TBW's sales managers calling on customers at their locations and selling cases directly off the trucks. Sales are rarely conducted by

phone or through email, let alone in person at TBW's New Jersey facilities. Connors Decl., ¶ 67-69.

Nor is Red Bull aware of TBW hosting customers at its New Jersey facilities. While TBW may meet with customers at restaurants, other public places or at Red Bull Arena, TBW's facilities in New Jersey are not conducive to, nor used for, such purposes. In short, TBW's New Jersey facilities are not "outward facing" locations from which TBW sells directly to customers. Connors Decl., ¶ 70. These facts do not satisfy the NJFPA's "place of business" requirement.

The Third Circuit came to this conclusion in *Watchung*, 588 Fed. Appx. at 198. There, a water distributor's agreement only required them to have a warehouse in New Jersey. *Id*. The District Court found that direct sales to customers at the warehouse facility were not "substantial" and declined to enjoin the termination of the agreement because the distributor failed to demonstrate a likelihood of success on the "place of business" requirement of the NJFPA. *Id.* The Third Circuit affirmed for the reasons set forth by the District Court. *Id.*

Similarly, here, the Agreement only required that TBW maintain a warehouse somewhere in New York **or** New Jersey, and TBW has not demonstrated that any direct sales, let alone "substantial" direct sales, occur at either of its New Jersey warehouses. Thus, there is no basis to depart from the reasoning in *Watchung*. *See also Liberty Sales*, 816 F. Supp. at 1009 ("Of the five categories specifically

**excluded** from the statutory definition, Liberty's facility clearly falls within four of them. It was an 'office,' a 'warehouse' (Delaney's garage), a 'place of storage,' and a 'residence.'"); *contra Ocean City Express Co. v. Atlas Van Lines, Inc*., 46 F. Supp. 3d 503, 509 (D.N.J. 2014) (finding plaintiff adequately pled "place of business" requirement because, unlike TBW, plaintiff accepted walk-in customers at its NJ location and it was identified "as its retail address in any advertisements directed at its customers or potential customers").

### B. There is no Community of Interest Between Red Bull and TBW

"To find a community of interest, the alleged franchisee must 'establish that it was subject to the whim, direction and control of a more powerful entity whose withdrawal from the relationship would shock a court's sense of equity.'" *Orologio of Short Hills Inc. v. Swatch Grp. (U.S.)*, 653 F. App'x 134, 139 (3d Cir. 2016) (quoting *Colt Indus. Inc. v. Fidelco Pump & Compressor Corp*., 844 F.2d 117, 120-21 (3d Cir. 1988)). "Importantly, '[c]ommunity of interest means more than the mere fact that two parties share in profits or that the distributor rely on a single supplier.' Rather, in addition to such business entwinement, a franchise is characterized by certain 'indicia of control' of franchisor over franchisee." *Engines, Inc. v. MAN Engines & Components, Inc*., 2010 U.S. Dist. LEXIS 76541, at *16-17 (D.N.J. July 29, 2010) (quoting Garner, 1 *Franch. & Distr. Law & Prac*. § 5:29 (WL 2010)).

A "community of interest" exists "when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a **substantial investment** in goods or skill that will be of **minimal utility outside the franchise**." *ISI*, 130 N.J. at 359 (emphasis added). "[I]n order to find a 'community of interest,' two requirements must be met: (1) the distributor's investments must have been '**substantially franchise-specific**,' and (2) the distributor must have been **required to make these investments** by the parties' agreement or the nature of the business." *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 269 (3d Cir. 1995) (emphasis added). "Franchise-specific investments are usually tangible capital investments, such as a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs." *Beilowitz v. GMC*, 233 F. Supp. 2d 631, 640 (D.N.J. 2002).

Here, there is no "community of interest" between Red Bull and TBW. As TBW acknowledged in its December 2023 presentation to Red Bull, TBW – and not Red Bull – is responsible for and has control over personnel, training, marketing strategies, and sales strategies. Connors Decl., Exhibit 1. In addition:

- TBW was not required to make any initial payment or pay any initial fee at the start of its relationship with Red Bull in exchange for the right to sell Red Bull products or use the Red Bull's marks. Agreement, § XII.F.

- Most of the investments made by TBW are not specific to Red Bull (e.g., its vans and employees can be repurposed to distribution of other brands).

23

- TBW makes its own personnel decision independent of Red Bull. Connors Decl., ¶¶ 46-50.

- Red Bull does not require TBW to invest in marketing material or to use any particular marketing or promotional strategies. Connors Decl., ¶¶ 51-54.

- TBW does not assert that it was required to invest in any specialized equipment.

- Per the terms of the Agreement, TBW is free to distribute products other than the Competitive Product as defined in the Agreement. Connors Decl., ¶ 64.

- TBW does not invest material dollars in any training. Red Bull provides TBW with training materials for its employees, but they are not mandatory.

- Red Bull does not control the volume or product allocation that TBW purchases. Connors Decl., ¶ 63.

- The physical structure of the TBW locations is not controlled by or unique to Red Bull and is not franchise-specific. Rather, the structures could be used for a variety of other distribution purposes.

- Other than in van wrapping, Red Bull does not mandate that TBW purchase decorations, clothing or other merchandise with the Red Bull logos, and TBW's employees wear uniforms with the TBW logo. Connors Dec., ¶¶ 41-42.

- Red Bull does not have control over TBW's sale of products. For example, TBW "presells" product to many of its customers.  Typically, Red Bull and its distributors sell product directly off the trucks and receive payment at point of sale based on negotiated payment terms. By contrast, TBW presells to approximately 50-60% of its customers. That is, TBW walks into a retail location, receives an order from a customer, receives payment, and then delivers the product in the following days. TBW is the only distributor that engages in such presales. Connors Decl., ¶ 62.

- Red Bull meets with TBW regularly, but not for the purpose of "controlling" TBW. The purpose of these meetings is to discuss what Red Bull is seeing in the Territory, including Red Bull displays at retail locations, shelf space, sales numbers and other metrics that Red Bull tracks. Red Bull does not track these metrics to "control" TBW's operations. Rather, Red Bull uses this data to make suggestions to TBW regarding strategies that TBW can employ to increase sales based upon Red Bull's experience around the country. Red Bull does not use this data to maintain TBW's "compliance" or issue "defaults" to TBW. Connors Decl., ¶¶ 44-45.

- TBW acknowledged in the Agreement that it was not a franchise. The sudden reversal of position only after Red Bull exercised its contractual right to terminate the Agreement is extremely prejudicial to Red Bull, and TBW should be estopped from only now asserting that it is a franchisee. *Ridge Chevrolet–Oldsmobile, Inc. v. Scarano*, 238 N.J. Super. 149, 154 (App. Div. 1990) (equitable estoppel is applicable where "conduct, either express or implied, ... reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law.").

Courts in similar circumstances have found that no community of interest exists. *Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.*, 944 F.2d 1131, 1140 (3d Cir. 1991) (no community of interest where the investment in skills and the customer base associated with the purported franchisor were transferrable to future business endeavors); *Colt*, 844 F.2d at 117 (no community of interest where cooperation in marketing and use of plaintiff's promotional materials was suggested, not required, plaintiff-sponsored sales meetings held at alleged franchisee's place of business were not mandatory, plaintiff did not mandate a particular method in selling its products, and plaintiff did not set the sales quotas typical to a franchise arrangement, but instead relied on sales monitoring practices typically used by any sensible

manufacturer contemplating sales on credit); *DeLuca v. Allstate Ins. Co.*, 2011 N.J. Super. Unpub. LEXIS 3140 (Ch. Div. 2011) (no community of interest where insurance agents made no franchise-specific tangible capital investment, paid no initial or ongoing fees, office space may be used for other purposes, did not pay for signage or office furniture and "the near exclusive reliance on the build-up of 'franchise' specific goodwill, is insufficient as a matter of law to establish the requisite community of interest").

### C.     Even if the NJFPA Applies, Red Bull Has Good Cause to Terminate the Agreement

New Jersey courts find there is "good cause" to terminate an agreement governed by the NJFPA if a franchisee failed to substantially comply with its obligations under a contract. *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 317 (3d Cir. 2001). Here, Red Bull has good cause to terminate the Agreement because: (i) Red Bull has expressed concerns about TBW's performance against Total US, East Business Unit and peer-set distributors for years; (ii) Red Bull has consistently raised concerns about sales performance, in-store execution and inventory management; and (iii) TBW has failed to rectify its lagging performance. *See, e.g.*, Agreement, § V.A. ("Distributor shall use its best efforts to: (i) market, promote, distribute, and sell Product to Accounts in the Territory; [and] (ii) increase and maximize sales of Product in the Territory in order to achieve the highest practicable distribution of Product in the Territory.").

### III.   TBW WILL NOT SUFFER ANY IRREPARABLE HARM IF AN INJUNCTION DOES NOT ISSUE AND HAS AN ADEQUATE REMEDY AT LAW

A preliminary injunction cannot be granted absent a showing of "irreparable harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989). Of the four factors to be demonstrated for a preliminary injunction to issue, courts consider irreparable harm to the plaintiff the most important. *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 393 (D.N.J. 1989). To prove irreparable harm, TBW bears the burden of proof, and "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following trial.'" *Acierno*, 40 F.3d at 653 (quoting *Instant Air Freight*, 882 F.2d at 801). Economic loss "does not constitute irreparable harm." *Id*.

Simply establishing a **risk** of irreparable harm is also not enough; the word "irreparable" connotes "that which cannot be repaired, retrieved, put down again, atoned for." *Id*. TBW has not met its burden of proving that it has been or will be irreparably harmed by Red Bull exercising its rights and terminating the Agreement.

### A.   TBW's Delay Is Grounds Alone to Deny This Motion

Red Bull advised TBW on March 19, 2024, that the Agreement would terminate effective June 2, 2024. Nonetheless, Plaintiff waited six weeks from its receipt of Red Bull's notice to bring this Motion, and has done nothing to explain the reason for its delay. TBW's "delay in seeking preliminary relief cuts against

finding irreparable injury." *N.J. Assoc. of Health Care Facilities, Inc. v. Gibbs*, 838 F. Supp. 881, 928 (D.N.J. 1993); *see also Warner Lambert*, 718 F. Supp. at 393 (plaintiff's delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggest[s] that there is, in fact, no irreparable injury."); *Reedco, Inc. v. Hoffman-La Roche, Inc.*, 667 F. Supp. 1072, 1082 (D.N.J. 1987) (laches is a defense to issuance of injunction when opposing parties have been prejudiced by plaintiff's unreasonable delay in applying for relief). For this reason alone, TBW cannot meet its burden of showing irreparable harm.

As described above, TBW has spent the last six weeks winding down its operations – notifying employees and customers, cleaning out warehouses and failing to service customers. In other words, TBW is not seeking to maintain the status quo as it relates to continuing to perform under the Agreement. TBW also has been keenly aware of the time and money Red Bull is spending to prepare for the transition, and has allowed Red Bull to do so despite apparently intending to file this "emergency" Motion. Thus, any argument now that TBW will be irreparably harmed should be barred by the doctrine of laches. *See Graceway Pharm., LLC v. Perrigo Co.*, 697 F. Supp. 2d 600, 605 (D.N.J. 2010) (holding plaintiff's unexplained delay in filing for a preliminary injunction, or even putting the defendant on notice of future legal action, in conjunction with defendant's own business actions going ahead for weeks – at a significant expense to defendant – was grounds to deny a

preliminary injunction on the basis of laches, reasoning that if the harm to plaintiff were irreparable, plaintiff would have acted sooner and more deliberately).

Moreover, there can be no irreparable harm where, as here, TBW has no intention of ever seeking a permanent injunction – *see* Complaint at 18-19 (seeking only monetary damages and a preliminary injunction) – nor is that a remedy available to it under the NJFPA. *See Westfield Centr. Serv., Inc. v. Cities Serv. Oil. Co.*, 86 N.J. 453 (1981) (acknowledging that permanent injunctive relief is not appropriate under the NJFPA). The purpose of a preliminary injunction is to maintain the status quo during the pendency of litigation so a plaintiff does not risk having essentially no recourse at the end of a case where the damage has already been done. But that is not the case here. TBW's claimed "irreparable harm" is that the company will face its demise if the Agreement is terminated, but Red Bull cannot be ordered to continue under the Agreement in perpetuity. Thus, the only purpose of a preliminary injunction here would be to buy TBW time to work with other brands or put forth efforts to stay afloat.

TBW has not put forth any evidence of efforts it has made to stay afloat in these past six weeks, much less any attempt to work with other brands. Instead, as the enclosed declarations show, TBW has been focused on winding down its affairs, which will render it incapable of performing under the Agreement as of June 2, and making any preliminary injunction effectively illusory. Because there cannot be a

permanent injunction here, and TBW has not met its burden of showing why equitable relief is necessary to prolong the inevitable, it has failed to demonstrate irreparable harm.

### B.   Any Harm to TBW Is Compensable by Money Damages

TBW nevertheless argues that it will suffer irreparable harm without an injunction based on the allegation that termination of the Agreement "ensures Beverage Works' demise." Motion, at 23. But harm that has occurred or is already occurring is not irreparable. Since a threat, by definition, can only encompass an action that is about to occur, "[h]arm that has already occurred cannot be remedied by an injunction." *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir. 1981).

In the six weeks it waited to file this "emergency" motion, TBW has been undertaking efforts to wind down its business affairs. In other words, TBW waited until it set the wheels in motion to close down before coming into Court. Now TBW is attempting to do what is impossible both legally and practically: enjoin something that is already happening. There is no putting the cat back in the bag as it relates to the steps TBW has taken to prepare for the Agreement's termination and, therefore, any harm to TBW is no longer irreparable.

Moreover, even if TBW ceases to exist upon termination of the Agreement, and in the improbable event it was later determined that Red Bull's termination was wrongful, TBW can be "readily compensated by money damages." *Dunkin' Donuts*

*v. Elkhatib*, 2009 WL 2192573, at *6 (N.D. Ill. July 17, 2009) (applying the NJFPA). Red Bull cannot be forced to continue operating under the Agreement in perpetuity. Thus, even if TBW is successful on its claims at trial, its sole remedy would be money damages, without a permanent injunction. *Westfield*, 86 N.J. at 453 ("where a franchisor, acting in good faith for a bona fide reason, terminates a franchise in accordance with the terms of the agreement, permanent injunctive relief would not be appropriate, even though damages under the statute would be available."); *In re Arthur Treacher's Franchisee Litig*., 689 F. 2d 1137, 1145 (3d Cir. 1982) ("[W]e have never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law."); *Frank's GMC Truck,* 847 F.2d at 102 (availability of money damages belies claim of irreparable injury).

The fact that the plaintiff could be compensated with money damages caused the Third Circuit to vacate a preliminary injunction in *Instant Air Freight*, 882 F.2d at 797. In that case, the trial court had enjoined the defendant from terminating its freight handling contract with the plaintiff based on a finding of irreparable harm. The Third Circuit reversed, finding that the damages the plaintiff alleged were "capable of ascertainment and award at final judgment if [the plaintiff] prevails" given the "lengthy history of the two companies' association" and the history of performance under the parties' contract. *Id*. at 801-02.

Here, just as in *Instant Air Freight*, any money damages are provable with reasonable certainty given the lengthy relationship between Red Bull and TBW.[3] TBW has not made any allegations whatsoever about Red Bull's ability to pay any potential judgment, but there is "no question that an award of damages would be collectable." *Id*. TBW thus cannot show that it will be irreparably harmed if a preliminary injunction does not issue.[4]

The cases cited by TBW on irreparable harm are distinguishable. *Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 677 (D.N.J. 1998), involved the "unique" relationship between the parties due to the development of the gaming industry in Atlantic City, which is not present here. In other cases[5], the movant expressed a desire to continue operating with the licensor, which TBW has not expressed here. In *Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 677 (E.D. Wis. 2005), the court emphasized the post-termination restrictive covenant that prohibited

---

[3] TBW also makes reference to "lost goodwill" in its brief, but it ties this type of alleged harm to end caps, shelving, and promotional displays, which TBW claims will be worth nothing if Red Bull is not enjoined from terminating the Agreement. However, the investments made by TBW, if any, in these promotional items are likewise easily calculable and reimbursable by money damages. And in any event, any goodwill is that of Red Bull, not TBW, given Red Bull's extensive promotion of its marks in the Territory.

[4] TBW presumably filed the Motion to buy itself time to avoid penalties under the applicable WARN Acts. While there appears to be exceptions to the WARN Act that would enable TBW to avoid penalties, even if TBW is penalized for violating those statutes, that too is redressable by money damages.

[5] *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970), and *Associated Producers Co. v. Independence*, 648 F. Supp. 1255 (W.D. Mo. 1986).

the movant from acting in the same business – there is no such covenant here. Finally, in *Carlo C. Gelardi Corp. v. Miller Brewing Co*., 421 F. Supp. 233, 236 (D.N.J. 1976), the court only entered a very brief injunction to allow the non-moving party to comply with the 60-day notice period in the NJFPA, which Red Bull has already more than complied with by giving TBW 77 days' notice. None of TBW's cited authority demonstrates irreparable harm here.

## IV.   THE BALANCE OF HARMS TIPS DECIDEDLY IN RED BULL'S FAVOR

The balance of equities further fails to support the entry of an injunction. As shown in the preceding section, TBW has not shown irreparable harm. Conversely, an injunction would cause severe harm to Red Bull, as it has already undertaken significant efforts to take over the Territory beginning June 3.

As the Motion makes clear, the parties have been in ongoing discussions since Red Bull sent its termination letter on March 19, including agreeing to mediate the dispute on May 28. Given these productive discussions and agreement to mediate, TBW never once indicated to Red Bull that it was contemplating going to court to seek an injunction. Having no idea that TBW intended to completely ignore the parties' discussions and file the Motion, Red Bull forged ahead, expending significant time, effort, and vast sums of money on transitioning TBW's Territory to RBDC.

If the Court enjoined Red Bull from terminating the Agreement, the repercussions to Red Bull's business in the Territory would be devastating and incalculable (in addition to the millions it would cost to unwind aspects of the transition and the over one million in monthly carrying costs). Mangold Decl., ¶ 5.[6] As a result, Red Bull would lose significant business, goodwill, and potentially customers, some of which it may not be able to recover. *MNI Mgt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 419 (D.N.J. 2008) (denying preliminary injunction where more harm would come to the defendant in the form of loss of goodwill with customers and potential customers and through the disruption caused to their business operations); *LexJet, LLC v. Big Dog Media Solutions, LLC*, 2014 WL 7642095, at *10 (M.D. Fla. 2014) (denying preliminary injunction, and noting that "in balancing the respective harms, it is apparent that the lack of a preliminary injunction in favor of [plaintiff] will cause [plaintiff] little harm going forward while the entry of an injunction on the terms outlined above would cause a substantial disruption in [defendant's] ongoing business and far more harm"). TBW's delay in

---

[6] Mr. Mangold provides the following examples of harm that would be sustained by Red Bull if an injunction is entered: (1) stores will not know who is servicing their accounts and may be left with insufficient supply of Red Bull products and unclear communication; (2) key accounts have already begun updating their systems from TBW to RBDC, and for two of Red Bull's largest customers, 7-Eleven and Walmart, system changes require 60 days' notice; (3) employees will be in limbo, not knowing where to report to work on June 3 and what this means for their future employment; and (4) Red Bull would be carrying millions of dollars in operating costs and employee salaries each month. Mangold Decl, ¶ 5.

seeking this injunction has severely prejudiced Red Bull, and granting an injunction now would cause irreparable harm only to Red Bull and not to Plaintiff.

Moreover, TBW has been winding down its business. It is unlikely that TBW can even continue to operate under the terms of the Agreement post-June 3, much less operate in accordance with Red Bull's high standards of quality and customer service. If this Court granted the injunction Plaintiff seeks and Red Bull was unable to terminate the Agreement, Red Bull would have no recourse against TBW if, for example, it could not meet the supply demands of retailers and end-customers, which would thereby harm Red Bull's brand. As noted above, Red Bull is **already** being notified by customers that it is without any product from TBW. Courts have consistently held that a franchisor's inability to control the nature and quality of goods and services provided under its brand name irreparably harms the franchisor. *See Super 8 Motels, Inc. v. Sai Krupa Victoria, Inc.*, 2006 WL 2830965, at *5 (D.N.J. Sept. 29, 2006). This concern is heightened here given that TBW has already stopped servicing accounts (or telling them it plans to in the near future) and customers have been reaching out to Red Bull concerned and confused. TBW should not be permitted to operate haphazardly under the Agreement while Red Bull has its hands tied by an injunction.

## V.   TBW HAS NOT SHOWN THAT THE PUBLIC INTEREST WILL BE SERVED BY AN INJUNCTION

TBW does not even address the public interest in its Motion. Nevertheless, in ruling on a motion for injunctive relief, a court must consider the public's interest. Here, the Agreement gives Red Bull the clear right to terminate the parties' agreement at any time, for any reason. There is a strong public interest in enforcing contracts, which TBW entirely fails to address. *Money Marketing v. Silver Aspen, Inc.*, 2006 WL 8457663, at *5 (D.N.J. June 9, 2006) ("The public has an interest in ensuring that valid contractual provisions are enforced."). In addition, given the public statements that already have been made to customers in the Territory, any injunction would cause massive customer confusion and disruption, which would not be in the public interest. *WindSoft Inc. v. Intercon Sys. (1988) Ltd.*, 1995 WL 903453, at *6 (D.N.J. Sept. 12, 1995) ("This Court also finds that it is in the public interest that prior to the final resolution of this dispute, there be no undue interference with the efficient operation of the marketplace."). This is underscored by the fact that permanent injunctive relief is not available under the NJFPA. *Alboyacian v. BP Prods. N. Am.*, 2011 U.S. Dist. LEXIS 134453, *7 (D.N.J. Nov. 2, 2011) ("To the extent that Count Nine seeks specific performance or an injunction forcing [Franchisor] to continue the franchise relationship, such relief is not available to the Franchisees….") Therefore, on balance, the public interest strongly weighs against the entry of an injunction here.

36

## VI.   TBW MUST POST SECURITY IF AN INJUNCTION IS ISSUED

Although TBW's motion should be denied, if this Court grants TBW the relief that it requests, Fed. R. Civ. P. 65(c) requires that TBW post security. TBW ignores this requirement. The failure to post security is "in direct conflict with Rule 65(c) of the Federal Rules of Civil Procedure, which mandates that a court when issuing an injunction must require a successful applicant to post adequate security." *Frank's GMC Truck,* 847 F.2d at 103. "[T]he instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Id*.; *see also Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (finding a district court to have abused its discretion by not requiring the posting of a bond).

The purpose of the security requirement as part of a preliminary injunction is to protect the party being enjoined from the harm caused to it by the restraints, in the event it is later determined that the restraints were inappropriate: "with rare exceptions, a [party] wrongfully enjoined has recourse only against the bond." *Instant Air Freight*, 882 F.2d at 804. To that end, a party who is determined to have been wrongfully restrained or enjoined has no action for damages in the absence of a posted bond. *W.R. Grace & Co. v. Local Union 759, Int'l Union of Un. Rubber, Corp. Linoleum and Plastic Worker*s, 461 U.S. 757, 770 n.14 (1983). Accordingly, "the bond serves to inform the [moving party] of the price they can expect to pay if the injunction was wrongfully issued." *Instant Air Freight*, 882 F.3d at 804.

The only "extremely narrow" exception to the requirement that a party successful in obtaining a restraining order post a bond is when there is no risk of any monetary loss to the enjoined party. *Zambelli*, 595 F.2d at 426. That is certainly not the case here.

As set forth above and in the Connors and Mangold Declarations, the requested injunction will permit TBW to continue servicing the Territory in a haphazard manner that will undermine Red Bull's goodwill, harm customers, and ultimately impact sales. Red Bull's efforts to prepare for the transition will also have been wasted, including tens of millions of dollars of expense in coordinating the changeover consisting of, among other things: informing customers and retailers which will inevitably result in significant lost sales to Red Bull; securing real estate; purchasing equipment, vehicles, and furniture; entering into contracts with vendors to service the new locations; preparing product; preparing displays; hiring new employees to take over the Territory; and relocating numerous existing employees.

The Motion fails to address the fact that it simply cannot continue operating after June 2 in light of its recent efforts to wind down, and TBW ignores the harm that will occur to Red Bull as a result. Clearly, TBW realizes it cannot obtain a permanent injunction under the NJFPA; thus, the Agreement is being terminated, the only question here is when (i.e., June 3, or at a later date if the Court enjoins the transition). In other words, the Motion only serves to prolong the inevitable.

Red Bull has grave concerns that TBW will leverage an injunction to continue reaping the benefits of the Agreement, but will no longer service Red Bull as a loyal distributor. Under the proposed order, TBW could take the time given to it during an injunction period to start seeking out other brands to work with in order to stay afloat, and will ignore the legitimate business needs of Red Bull and its customers in the interim  (as it already appears to be doing). If the Court grants the Motion, TBW could attempt to preclude Red Bull from terminating TBW even if TBW fails to perform under the Agreement. Finally, even without nefarious motives, TBW will simply not have the resources to service the Territory past June 3. TBW notified its employees on April 12 that the Agreement was terminated effective June 2. By April 19, just one week later, TBW was already acknowledging that "manpower is tight and expected to decrease as employees move on." Connors Decl., Exhibit 3.

Security to protect Red Bull from loss in the event it is wrongfully enjoined and thereby prohibited from immediately protecting itself from significant financial loss should be at least $10,000,000.[7]

---

[7] In the event an injunction is granted, harm to Red Bull will far exceed $10,000,000 and Red Bull reserves the right to request that the Court increase this amount depending on the duration of any injunction. To the extent the Court would like additional support for Red Bull's $10,000,000 bond request, Red Bull will promptly submit evidence supporting the costs it will incur if the injunction is granted and transition is halted, as well as the lost sales that Red Bull will suffer if it is unable to takeover the Territory as planned.

## <u>CONCLUSION</u>

For the reasons set out above, Red Bull requests that the Court deny TBW's Motion. Should the Court issue an injunction, Plaintiff should be required to post security in the amount of $10,000,000.

Dated: May 16, 2024                    Respectfully submitted,

                                       GREENBERG TRAURIG, LLP

                                       By:   s/ *Ian Marx*
                                             Ian Marx
                                             Aaron Van Nostrand
                                             500 Campus Drive, Suite 400
                                             Florham Park, NJ 07932-0677

                                             Jeffrey Greene
                                             Kelly Pesce
                                             Greenberg Traurig, LLP
                                             One International Place, Suite 2000
                                             Boston, MA 02110

                                             *Attorneys for Defendant*
                                             *Red Bull North America, Inc.*