**HINCKLEY, ALLEN & SNYDER LLP**
Mitchell R. Edwards, Esq.
100 Westminster Street, Suite 1500
Providence, RI 02903
Telephone: 401-274-2000
Facsimile: 401-277-9600
medwards@hinckleyallen.com

Christopher V. Fenlon, Esq. (admitted *pro hac vice*)
Kylie M. Huff, Esq. (admitted *pro hac vice*)
30 South Pearl Street, Suite 901
Albany, New York 12207
Telephone: (518) 396-3100
Facsimile: (518) 396-3101
cfenlon@hinckleyallen.com
khuff@hinckleyallen.com

**MARKS & KLEIN, LLC**
Justin M. Klein, Esq.
Brent M. Davis, Esq.
331 Newman Springs Road
Building 1, 4th Floor, Suite 143
Red Bank, NJ 07701
Telephone: 732.747.7100
Facsimile: 732.784.2850
justin@marksklein.com
brent@marksklein.com
*Attorneys for Plaintiff*
*The Beverage Works NY, Inc.*

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE BEVERAGE WORKS NY, INC., <br><br> Plaintiff, <br><br> -against- <br><br> RED BULL NORTH AMERICA, INC., <br><br> Defendant. | Civil Case No.: 24-cv-5745 (RK)(BD) <br><br> **REPLY AFFIRMATION OF CHRISTOPHER USTICK IN FURTHER SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION** |

I, Christopher Ustick, hereby affirms under penalties of perjury:

1. I am the Executive Vice President of The Beverage Works NY, Inc. ("Beverage

Works"), the Plaintiff in the above-referenced matter.

2. I submit this Declaration in further support of Beverage Works' Emergency Motion for a Preliminary Injunction and Temporary Restraining Order (the "Motion").

3. I have reviewed Defendant Red Bull North America's ("RBNA") filings in opposition to the Motion, including RBNA's Memorandum of Law in Opposition to the Motion [Dkt. No. 28] (the "Brief'), the Declaration of Bill Connors [Dkt. No. 28-1] (the "Connors Decl."), the Declaration of Scott Mangold [Dkt. No. 28-11] (the "Mangold Decl.") and the exhibits thereto (collectively, the "Opposition").

4. Perhaps the most shocking part of RBNA's Opposition was RBNA's new claim that RBNA otherwise had "cause" to terminate the distribution agreement,[1] notwithstanding that the purported termination was indisputably "without cause."

5. RBNA's position is false. Beverage Works distribution of Red Bull Products has, and continues to result in the highest market share for energy drinks in the most competitive market in the United States.

6. In fact, Beverage Works' market share in the territory in which it operates is *double* that of its largest competitors' market share, a fact that is widely known and acknowledged by RBNA.

7. Many of the factors of any decline in Beverage Works' sales volume of Red Bull Products in the territory are directly attributable to RBNA.

8. Indeed, for the last three years, RBNA has had major difficulties delivering a sufficient amount of Red Bull Products to Beverage Works.

9. Namely, in or around April of 2021, RBNA advised Beverage Works that RBNA

---

[1] A copy of the distribution agreement between Beverage Works and RBNA entered into on or around July 11, 2008 (the "Distribution Agreement") which governs the parties' current franchise relationship, is attached to the Verified Complaint (the "Verified Compl.") as Exhibit B.

2

was experiencing a supply chain problem due to the transition from overseas to domestic production of the Red Bull Products.

10. Then, RBNA placed a weekly limit on what quantity of products Beverage Works was allowed to order each week. This limitation continued for almost three years. <u>See</u> ex. Email from RBNA to Beverage Works dated October 11, 2022, which is attached hereto as <u>Exhibit S</u>.

11. Additionally, in 2022, RBNA imposed specific "volume caps" which were limits on sales to individual large accounts that RBNA unilaterally handpicked.

12. This lack of product flow to Beverage Works resulted in the lost sale of at least 2,000,000 cases of Red Bull Products over the 3 years RBNA's purchasing limit program was in place.

13. Moreover, despite being advised of the relentless "grey market" Red Bull Product infiltration in the Territory,[2] RBNA has either failed to take any action or has been completely ineffective in curtailing the grey market product. "Grey market" is the trade of a product through distribution channels that are not authorized by the original manufacturer. Unlike counterfeit products, these are Red Bull Products manufactured by RBNA, but are being sold to retailers in Beverage Works' territory by a third-party not authorized to distribute the products within the Territory.

14. RBNA's unwillingness or inability to stop grey market product from coming into Beverage Works territory goes back many years. In 2018, RBNA's own business plan presentation indicated that the grey market products cost Beverage Works 250k cases ($8.75mm) in sales for that year. <u>See</u> Excerpt for RBNA PowerPoint, attached hereto as Exhibit T.

15. Since 2018, Beverage Works has made persistent requests of RBNA to find the source of the below market priced, grey market products. Beverage Works provided RBNA with

---

[2] Capitalized terms not otherwise defined shall have the meaning ascribed to them in the Verified Complaint.

pictures of the can, batch numbers, invoices, and other facts in an effort to assist RBNA in eliminating this unfair competition.

16. As a result of the grey market infiltration, Beverage Works lost sales and profits of a projected 2,000,000 cases of Red Bull Products. This is in addition to the lost sales caused by RBNA's inability to deliver a sufficient amount of product to Beverage Works.

17. Beverage Works was also forced to suffer more losses as RBNA made Beverage Works the sole redeemer, and, as a result, Beverage Works was forced to accept returns on this grey market product. This resulted in Beverage Works having to provide a credit to retailers even though the retailer did not purchase the product from Beverage Works.

18. During a February 2024 market tour with Conners, he indicated to me that the grey market below market priced product "was coming from Florida after all." Distribution of Red Bull Products in the state of Florida is operated by an affiliate of RBNA.

19. If RBNA would have been able to supply Beverage Works with enough with product to meet market demand and was effective in stopping the below price grey market product flow, Beverage Works would have exceeded the Eastern Business Unit[3] and national volume figures.

20. Notwithstanding the internal obstacles and competition directly from RBNA, and other external pressures in the market, Beverage Works had and *still has the highest market share in the nation* as compared to any other Red Bull territory. This is due to Beverage Works' ability to successfully compete with other brands in the market by occupying the commanding "eye to thigh" prime shelf space, as well as maintaining coolers and displays occupying valuable floor space considering our over two decades of servicing the market.

21. This execution deprives competitors from growing and maturing. Beverage

---

[3] "Eastern Business Unit" is a term used by RBNA to describe distribution territories located in northeast quadrant of the United States.

Works' deep multilevel relationships with its retailers cultivated over 24 years, as well as its stellar service, are the drivers of market share.

22. RBNA acknowledges that "[f]or many years, Red Bull was able to maintain a strong market position in the New York region." Brief at 4.

23. However, RBNA's claim that "[t]his was more a result of competitive brands being unsuccessful in their efforts to gain a foothold in New York than of [Beverage Works'] performance" is false and the exact opposite is true. Id.

24. Beverage Works' territory is different because we have mostly "independently owned" accounts as opposed to other Red Bull markets throughout the nation.

25. This actually makes it *easier* for competitive brands to gain a foothold in our market as there is *zero* barrier to entry to independently owned accounts. There are no corporate buyers, red tape, slotting/placement fees, or other barriers to getting a product into these independent stores. One can just walk into the store and make a pitch. As a result, this is why Beverage Works' territory is so competitive and dynamic.

26. RBNA claims that the Red Bull Products' "position of strength has eroded over recent years as a host of new competitive brands have gained popularity." Id. at 4 (citing Connors Decl. at ¶ 5).

27. This "erosion" of "position of strength" cannot be attributed to any action by Beverage Works, but, rather, it results from consumers selecting competitive brands such as Celsius over Red Bull. Notwithstanding the added pressure from competitors, Beverage Works has maintained its foothold in the market.

28. Simply put, if RBNA has been so dissatisfied with Beverage Works' performance for the last ten years, it would not have improperly attempted to terminate the Distribution Agreement "without cause."

29. RBNA's alleged dissatisfaction is belied by the fact that RBNA has not sent a single

5

notice of default under the Distribution Agreement to Beverage Works in the twenty-four year relationship of the parties.

30. In fact, RBNA has terminated dozens of distributors without cause all across the nation in the last decade.

31. RBNA claims that "in the six weeks between the termination notice and the motion, both parties operated on [the] assumption" that RBNA would "take over distribution in the Territory on June 3" and that "the parties worked together on a transition plan." Brief at 1. This is untrue.

32. Upon information and belief, RBNA has been planning this improper termination for at least a year, with RBNA using fictitious company names or a third party in its takeover plan in order to go undetected. RBNA has terminated dozens of independently owned distributors in favor of their self-distribution model since 2009.

33. On or around March 19, 2024, after hearing a rumor that RBNA was planning to terminate the Distribution Agreement effective May 1, 2024, I reached out to Bill Conners, the Executive Vice President and General Manager of RBNA, to inquire if there was any validity to the rumor.

34. Connors responded with a request to have a meeting and, later that day, Beverage Works was notified that the Distribution Agreement was indeed being terminated.

35. During the six-week period between the Termination Notice and the initiation of the instant case, Beverage Works retained counsel, determined its rights and formulated a plan of action.

36. To the extent there was communication between Beverage Works and RBNA during this period, it consisted of Beverage Works attempting to reach an agreement with RBNA that would alleviate the need to involve the Court. In fact, Beverage Works had multiple meetings with RBNA representatives to discuss the purported termination in which Beverage Works

6

continuously made clear our intentions of disputing the validity of the termination.

37. In fact, just eight days after the purported termination Beverage Works informed RBNA of its NJFPA violation and expressly reserved its rights to pursue all claims, a copy of which is attached hereto as Ex. R (the "March 27, 2024 Reservation of Rights Letter").

38. There was no "working together" on the transition. RBNA had requested that Beverage Works keep the Termination Notice confidential for two to three weeks. RBNA was simply directing Beverage Works on the steps RBNA wanted Beverage Works to take in preparation for RBNA seizing the territory.

39. When RBNA stated it was going public with its takeover and would begin hiring employees, in an effort to keep its employees from finding out about RBNA's impending improper termination by seeing job postings on public job boards, Beverage Works advised its employees that it had received the Termination Notice from RBNA and was exploring its options. At no time did Beverage Works advise its employees that it would cease distributing Red Bull Products. In fact, we continue to do so through the preparing of this Affirmation.

40. The improperly attempted termination created significant uncertainty for Beverage Works and its employees and was exacerbated by the fact that RBNA's successor distributor, RBDC, began actively recruiting Beverage Works' employees.

41. Moreover, RBNA's argument that Beverage Works is winding down or that it otherwise cannot stay in business through June 2024, is demonstrably false.

42. Since receiving the Termination Notice, RBNA continues to employ hundreds of people, service accounts daily and open new accounts, and Beverage Works' business continues to thrive.

43. For example, Beverage Works continues to employ more than 330 employees.

44. In April 2024, Beverage Works sales grew 14.5% as compared to the prior year and was the highest sales volume in the history of the business.

7

45. Beverage Works secured 25 new accounts during April 2024 alone, and it continues to secure additional shelves in its accounts.

46. Beverage Works is currently, and is wholly prepared to continue, performing under the Distribution Agreement and selling the Red Bull Products to retailers in the Territory.

47. RBNA claims that Beverage Works "is not prohibited" from "distribut[ing] any products other than Red Bull Energy Drinks…." Brief at 4 (citing Connors Decl., at ¶¶ 8 and 64. This is untrue as Beverage Works is an exclusive Red Bull distributor and RBNA refers to Beverage Works and the other exclusive distributors as "RBO," which stands for "Red Bull only".

48. During the term of the Distribution Agreement, and pursuant to its terms, Beverage Works approached RBNA multiple times to allow Beverage Works to distribute other non-energy beverage brands and organic snack brands, but RBNA withheld its approval every time.

49. For example, in the fall of 2017, I approached RBNA General Manager Jason Cantelli with a proposal that Beverage Works could form a partnership with Hain Celestials, manufacturer of organic snacks under the brands Veggie Straws and Sensible Portions, which included market research, mock-ups of product racks and other materials prepared by Beverage Works.

50. RBNA refused to let Beverage Works distribute the Hain Celestials product.

51. RBNA claims that it "did not… mandate that [Beverage Works] hire a general manager, recommend people, or review resumes." Brief at7 (citing Connors Decl. at ¶¶ 46-47). This is false.

52. In actuality, RBNA exerted substantial pressure on Beverage Works regarding Beverage Work's personnel and hiring.

53. RBNA instated "The Red Bull Evolution" program where auditors created "action plans" for Beverage Works to execute. This program included personnel processes and compensation, and a systemic employee review program where RBNA employees demanded and

8

executed reviews of Beverage Works employees with an action plan.

54. RBNA made specific demands regarding Beverage Works' personnel as well. For example, in 2007, RBNA's then Vice President and General Manager Peter Strahm even issued a demand that Beverage Works fire a senior employee.

55. In 2018, RBNA's then Vice President and General Manager Amy Taylor required that Beverage Works hire general managers from the outside under the threat of termination.

56. In October 2017, RBNA forced Beverage Works to rescind a job offer to a candidate for the position of sales manager because the hire was not approved by General Manager Jason Cantelli.

57. RBNA's claim that it "encourages its distributors to have its employees participate in trainings and keeps track of who completes the modules, [but RBNA] does not require its distributors' employees to complete these trainings" is also false. Brief at 7.

58. RBNA conducted key account training that Beverage Works employees were required to attend. RBNA demanded that Beverage Works have employees that were SME (subject matter experts). This demand required that Beverage Works employees undertake training including "Power" coaching, "Power" selling trainings, and "Perfect Store training." RBNA required that Beverage Works' employees complete the training in order to receive certification.

59. With regards to Beverage Works' usage of Red Bull trademarks, RBNA falsely claims it "did not require [Beverage Works] to purchase decorations, clothing or other merchandise with the Red Bull logos." Id. at 9.

60. Over the years, RBNA demanded Beverage Works make investments in its "feet, facility, & fleet." The "feet" referred to uniforms. At the same time, RBNA developed an in-house uniform department and Beverage Works then purchased uniforms from RBNA.

61. RBNA also misrepresents "a presentation prepared by [Beverage Works] that [Beverage Works] presented to [RBNA] in December 2023. Brief at 10. RBNA falsely claims

9

that, in that presentation, Beverage Works "detailed its own plans for personnel, training, marketing strategies, sales strategies, etc."

62. This presentation is taken out of context. RBNA demanded that Beverage Works attend an annual Eastern Business Unit business plan meeting where RBNA communicated what it wanted from distributors like Beverage Works including volume plans, tactics, programs, and investments. RBNA then demanded that the distributor take these plans and produce a localized plan. RBNA even sent a template of requirements for Beverage Works to then populate. Essentially, Exhibit 1 to the Connors Decl. is the result of Beverage Works presenting RBNA's plan back to them from a local perspective in the form created by RBNA.

63. RBNA then falsely claims that Beverage Works' "organizational leadership structure is opaque, with unclear hierarchy and antiquated practices." Brief at 10.

64. Beverage Works is a modern distributor built for the NY/NJ market. The structure has been reviewed and approved by RBNA multiple times through multiyear Red Bull Evolution audits, a 2020 meeting with RBNA's distribution affiliate (requested by RBNA), and a subsequent RBNA review with RBNA's General Manager Keary Millard and Director of Distribution Andrew Lamanno, as well as annual business plans submitted by Beverage Works to RBNA.

65. Each time, Beverage Works scored high marks from RBNA for its low District Manager to Account Manager ratio, its technology, and its processes.

66. Beverage Works has specialist roles that are above and beyond what many distributors have, including, but not limited to, club store, airports, college, and vending specialists, and new account openers. These specialist roles are all designed to meet the needs of the unique territory in which Beverage Works operates.

67. The Route accounting software used by Beverage Works is also used by some of the largest distributors in the nation such as Manhattan Beer and JJ Taylor.

68. Beverage Works uses the program Roadnet for routing which has been recognized

10

as the gold standard. Many of our systems are also used by RBNA's distribution affiliate.

69. Some systems used by Beverage Works are more advanced than RBNA's own distribution arm, such as a platform called "CPG Data" that measures market execution photographically with geo fenced, time stamped information, as well as service quality control and competition information.

70. Furthermore, RBNA leadership has always been complimentary of Beverage Works. For instance, Eastern Business Unit VP/GM Amy Taylor stated to me in 2018 that Beverage Works was "uniquely qualified to be the RB distributor in NY" due to the deep relationships that have been curated over 24 years.

71. During the 2020 COVID-19 pandemic Beverage Works never missed a beat and maintained stellar service and execution and were hailed as HEROS by RBNA.

72. Later in 2020, RBNA celebrated the 20-year anniversary of Beverage Works by producing a full featured film montage highlighting our successful 20 year partnership with Red Bull.

73. Next, RBNA falsely claims that Beverage Works "has also done very little to modernize its warehouse space, in some cases operating out of the same warehouse spaces for over 20 years." Brief at 10. This is also untrue.

74. All of Beverage Works' warehouses are AIB Certified, which is an attestation of a company's compliance with strict food safety standards.

75. AIB certification, which is not mandatory, has much stricter requirements compared to the regulations prescribed by federal, state and local law. AIB certification demonstrates that the warehouse and its operator go above and beyond to ensure absolute food safety, recall readiness and the optimization of all operational processes.

76. Further, Beverage Works has spent tens of thousands of dollars relocating from its Fairfield, New Jersey facility to an upgraded facility in East Hanover, New Jersey. Beverage

11

Works undertook this expense and move in response to RBNA's 2022 forecast of an additional 1,000,000 cases of Red Bull Product that never materialized due to the supply chain issues RBNA experienced as discussed above.

77. Beverage Works also invested in upgrading its Rock Tavern facility and was in the process of renovations to its Farmingdale facility when it received the Notice of Termination.

78. Confusingly, as an example of Beverage Works' alleged poor performance, RBNA states that Beverage Works "still operates with a cash sales system when most other distributors have transitioned to cashless systems" and that RBNA recommended that Beverage Works "move away from [accepting] cash" from its customers, which Beverage Works declined. Brief at 10 (citing Connors Decl. at ¶¶ 10-11).

79. Beverage Works' territory has thousands of independent accounts that prefer to pay in cash.

80. Many other large distributors in the area, also accept cash payment as it simply is a feature of the market.

81. In order to provide safety to its delivery drivers, Beverage Works has installed drop safes in the trucks and the driver does not possess a key.

82. Further, Beverage Works conducted a test of the "money order" system that RBNA recommended. However, the test was a failure as it resulted in numerous trips in and out of stores and Western Union locations each time the $500 maximum was reached for a money order. This created an unsafe situation where drivers had to move cash, subjecting them to a potential robbery or theft. Additionally, it added additional expense to Beverage Works for the cost of the money orders and, more importantly, unnecessary exposure to crime.

83. RBNA accusingly states that Beverage Works "claims its 'corporate office' is in New Jersey, it actually is a New York corporation. Brief at 20.

84. Beverage Works' principal place of business is in Wall, New Jersey, as identified

on both the New York and New Jersey Secretary of State databases.

85. Beverage Works has had its corporate office in New Jersey since 2000.

86. Further, the Distribution Agreement expressly anticipates that Beverage Works would distribute its products in New Jersey as the Territory includes the following New Jersey counties: Bergen, Burlington, Essex, Hudson, Hunterdon, Mercer, Middlesex, Morris, Monmouth, Ocean, Passaic, Somerset, Sussex, Union, and Warren. *See* Schedule B of the Distribution Agreement.

87. Beverage Works has maintained two facilities in the northern and southern parts of New Jersey for more than twenty years.

88. RBNA knew that Beverage Works had a New Jersey place of business when it entered into the Distribution Agreement in 2008.

89. Beverage Works delivers Red Bull Product to its customers and its personnel visit or call upon its customers from these facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 23, 2024

_____
Christopher Ustick